# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 7, 2007

Charles R. Fulbruge III
Clerk

No. 06-60597 & 06-60779

GEORGE G. GREEN

Petitioner-Appellant

v.

COMMISSIONER OF INTERNAL REVENUE

Respondent-Appellee

Appeal from the United States Tax Court

Before GARWOOD, JOLLY, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This appeal involves a final order of the United States Tax Court finding that Petitioner-Appellant George Green ("Green") failed to properly report settlement proceeds as taxable income and improperly deducted certain expenditures and losses as business expenses and losses. The Tax Court also sustained the Commissioner's assessment of accuracy-related penalties for these deficiencies. We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The income at issue in this case resulted from a whistleblower lawsuit that Green brought against the Texas Department of Human Services ("TDHS"), the failure of the state of Texas to pay the resulting judgment, and ultimately, a

monetary settlement between Green and Texas. The following facts, except where noted, are taken from the Tax Court's Findings of Fact.

A.    Whistleblower Lawsuit

While working as an architect for TDHS, Green came to believe that officials with TDHS were engaged in a pattern of fraud and corruption. Green discussed the misconduct with his supervisors, and when they failed to act, he advised numerous TDHS employees that he intended to report the misconduct to authorities outside of the department. On December 12, 1989, Green was fired for allegedly abusing sick leave, falsifying official documents, and misusing his business phone.[1]

On March 9, 1990, Green filed suit against TDHS under the Texas Whistleblower Act. Green's suit was tried before a jury in August and September of 1991. The jury found that Green was fired in retaliation for reporting misconduct at TDHS, and awarded Green $3,459,832 in compensatory damages and $10,000,000 in punitive damages.[2] On October 10, 1991, the trial court entered judgment in favor of Green in the amount of $13,773,461.96.[3]

---

[1] TDHS also referred the matter to the district attorney for prosecution of alleged criminal violations, and Green was indicted for falsifying documents, a third-degree felony. After the filing of Green's whistleblower suit, the district attorney offered to drop the criminal charges against Green if he would drop his lawsuit. Green refused. Shortly before the trial of the criminal case, the district attorney dismissed the charges under the indictment, pending further investigation.

[2] The jury's award of compensatory damages was allocated as follows:

| | |
|---|---|
| Loss of earning capacity: | $928,000 |
| Past mental anguish: | $1,000,000 |
| Future mental anguish: | $1,500,000 |
| Out-of-pocket expenses: | $31,832 |

In addition, the trial court awarded prejudgment in interest in the amount of $154,246.57 through September 24, 1991, with an additional $237.97 per day until the judgment was signed. The judgment bore post-judgment interest of 10 percent per annum until paid.

[3] The Tax Court's opinion states that judgment was entered in the amount stated above, $13,773,461.96. However, according to the parties' First Stipulation of Facts submitted to the Tax Court, as well as the Government's brief, judgment was entered in the amount of $13,775,000. The difference is immaterial for our purposes.

B.     Green's Efforts to Collect the Judgment

After the entry of the judgment in October, 1991, Texas failed to pay Green any portion of the judgment awarded.[4]   In 1993, after discharging his trial attorney, Green instituted legal proceedings and attempted to secure a legislative appropriation to obtain satisfaction of the judgment.  His efforts were unavailing.

In February of 1994, to assist him in the collection of the judgment, Green hired new counsel, John C. Augustine ("Augustine"), and a team of consultants to help him by raising public consciousness of his plight and getting the attention of lawmakers.  In order to fund the collection attempts, Green sold an interest in $1,000,000 of his ultimate recovery, if any, to James U. King ("King") for $500,000.  In 1995, Green formed Green Capital Corp. ("Green Capital") and TS Capital Asset, LLC ("TS Capital") for the purpose of employing consultants and advisers, including legal consultants, publicists, and other professionals, to attempt to collect the judgment from Texas.  In connection with these businesses, Green maintained  an office.

During 1994 and 1995, Green filed abstracts of judgments in several counties against Texas, all of which were unsuccessful in securing payment. Green and his representatives attempted to influence public opinion with newspaper articles, magazine articles, and television broadcasts about Green's

---

[4] Under Texas law, when an individual is awarded a judgment against the state, he must seek a legislative appropriation to collect the damages awarded to him.  See Tex. Dept. of Human Servs. v. Green, 855 S.W.2d 136, 145 (Tex. App. 1993).  The Texas Legislature, a bicameral body, convenes only in odd-numbered years.  All bills that affect revenues or expenditures are referred to the Legislative Budget Board which estimates the probable revenue cost of a bill.  The legislature may choose, through the appropriation process to pay all, some, or none of an individual's judgment against the state.  See Tex. Civ. Prac. and Remedies Code Ch. 109, et seq.; Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401, 415 (Tex. 1997) (Hecht, J. concurring).  When the legislature is not in session, the Governor of Texas or the Legislative Budget Board may, by emergency measure, propose an expenditure or distribution of funds by a state agency.  Tex. Const. art. XVI, § 69; Tex. Gov't Code Ann. § 317.002(b); § 317.003(a).

struggle to obtain satisfaction of his judgment. Green also filed a declaratory judgment action in a Texas trial court against Texas and the attorney general. Additionally, Green attempted to secure a legislative appropriation to pay the judgment. In 1995, two bills were introduced during the 74th regular session of the Texas Legislature to appropriate funds to satisfy the judgment, but neither of the bills were enacted.

During this time, Green was involved in a lawsuit with Allied Interests, Inc. ("Allied"), in which Green was being sued for expenses owed to Allied for services it rendered in connection with Green's attempt to collect the judgment. In 1996, a judgment in favor of Allied was entered against Green and Green Capital. In 1998, Green paid Allied $753,629, including punitive damages of $365,000, in satisfaction of Allied's judgment.

Between 1991 and 1995, while engaged in his efforts to collect the judgment, Green's mental and physical health deteriorated significantly, requiring repeated hospitalization for a bleeding ulcer.

C. Settlement

After the legislature failed to appropriate funds for payment of the judgment, Green approached the Legislature Budget Board ("LBB"). Green and Augustine worked with Lieutenant Governor Bob Bullock ("Bullock"), the chairman of the LBB, in order to convince the LBB that an emergency warranted the issuance of a budget execution order authorizing TDHS to expend funds to satisfy the taxpayer's judgment. Green met with Bullock on several occasions to discuss Green's unsuccessful efforts to collect the judgment and his continued stress and failing health. Augustine informed Bullock that Green was willing to negotiate some sort of settlement and that at that point, the judgment had reached over $20,000,000 because of the accruing interest.

Although not noted by the Tax Court, the foreman of the jury in the whistleblower lawsuit, Richard G. Fogg ("Fogg"), also advocated on Green's

4

behalf. Fogg attended one of Bullock's meetings with Green and discussed Green's ongoing health problems stemming from the collection of the judgment. During this meeting, Bullock told Green and Fogg that "there wasn't enough money in the State treasury to pay [you] for what you went through."

Green and Texas entered into a written Release and Settlement Agreement ("settlement agreement") dated November 8, 1995. Augustine and Harry G. Potter, III ("Potter"), a special assistant attorney general for Texas, were responsible for drafting the agreement. In relevant part, the settlement agreement provided:

4.    The State shall make a cash payment of $3,427,999.87 to Plaintiff for damages for loss of earning capacity, mental anguish and suffering (past) and suffering (future), in accordance with the findings specified and incorporated into the Final Judgment in Cause No. 480,701. [("Paragraph Four")]

5.    The State shall fund annuities for additional damages associated with the Final Judgment in Cause No. 480,701, which in turn shall pay to Plaintiff monthly installments, commencing January 4, 1996 and continuing until December 4, 1998, each in the amount of $13,499 with a final judgment payable on January 4, 1999 in the amount of $3,000,000. The State shall purchase the annuity contracts described herein naming Plaintiff as payee in order to ensure that these monetary obligations are met. [("Paragraph Five")]

6.    For all other damages, including punitive, prejudgment and post-judgment interest, the State shall fund an annuity or annuities, which in turn shall pay to Plaintiff monthly installments, commencing on January 4, 1996 and continuing until December 4, 1998, each in the amount of $7,924 with a final payment payable on January 4, 1999 in the amount of $1,761,000. [("Paragraph Six")]

A quorum of the LBB met on November 15, 1995 and proposed a budget execution order that authorized TDHS to pay Green: "a settlement, including attorneys fees . . . in the amount of $13,775,000, contingent on the fact that acceptance of this amount by George Green constitutes a complete release by George Green of all claims and causes of action that George Green may have against the state of Texas arising from the case of George Green v. Department of Human Services." On November 15, 1995, the LBB adopted the proposed budget execution order, which was ratified by then Governor George W. Bush.

On November 17, 1995 Green received a payment for $3,427,999. Green received $13,455 per month from January, 1996, through December, 1998, under the first annuity, and $7,924 per month during the same period from the second annuity. Additionally, in January, 1999, Green received the final payments of $3,000,000 and $1,761,000 under the respective annuities. The total amount paid under Paragraphs Five and Six of the settlement agreement was $10,347,000.13.

D.    Green's Tax Returns

On his 1995 federal tax return, Green excluded the payment of $3,427,999.87 that he received under § 104(a)(2) of the Internal Revenue Code ("Code"), which provides an exclusion for "damages received . . . on account of personal injury or sickness." On his federal tax returns for 1996, 1997, and 1998, Green reported the annual payment of $95,088 ($7,924 per month) from the second annuity, made under Paragraph Six of the settlement agreement, as taxable income. In those three years, Green did not report the $161,988 ($13,499 per month) received under the first annuity and Paragraph Five as taxable. In statements attached to the 1997 and 1998 returns,[5] Green asserted that the $161,988 was not taxable because it represented additional damages other than

---

[5] Green's 1997, 1998, and 1999 returns were prepared by Hunter & Atkins Inc.

punitive and interest and is excluded from income under § 104(a)(2) of the Code. Green did not report the lump-sum payments of $3,000,000 and $1,761,000 as taxable income on his tax return for 1999. Instead, he attached a statement to his return claiming that the $3,000,000 constituted "additional damages" received from Texas and that the $1,761,000 constituted "all other damages" and asserting that both payments were excludable under § 104(a)(2) of the Code.

For each of the years 1995 through 1996, Green claimed losses with respect to his interests in Green Capital and/or TS Capital. These claimed losses arose from expenses incurred by Green in attempting to collect his judgment and defend himself in the Allied litigation. Such expenses consisted of, among other things, payments to attorneys and consultants and office expenses. Green deducted all of these expenses as trade or business expenses under § 162 of the Code. As a result of the claimed losses, totaling $1,470,789, Green reported no tax due for any years at issue except 1997, for which Green reported a tax due of $8,066.

In July, 2001, Green filed amended federal income tax returns for the years 1996, 1997, and 1998. On the amended returns, Green claimed that $95,088 of reported income was not includable as income under § 104(a)(2). This resulted in Green requesting a refund of $7,654 for 1997.

E.    Legal Proceedings

Upon auditing Green's return, the Commissioner of Internal Revenue ("Commissioner") issued two notices of deficiency to Green, one for 1995 through 1998, and one for 1999. The Commissioner determined that all of the payments received by taxpayer from Texas during the years at issue were includable in Green's income. The Commissioner also disallowed all losses claimed by Green with respect to his interests in Green Capital and TS Capital for the years at issue. In addition, the Commissioner determined that Green was liable for

accuracy-related penalties under § 6622(a) of the Code for all of the years at issue.

Green filed two petitions in the Tax Court seeking redetermination of the deficiencies. The Commissioner conceded that the $3,427,999.87 received by the taxpayer under Paragraph Four of the settlement agreement, which provided for the payment of compensatory damages to taxpayer, was excludable from his gross income under § 104(a)(2) of the Code. As to the excludability of the payments under Paragraphs Five and Six of the settlement agreement; the deductibility of the business expenses; and the appropriateness of the accuracy-related penalties, the Tax Court conducted a trial.

First, the Tax Court found that Green had failed to establish that Paragraph Five of the settlement agreement was intended to compensate Green for personal injuries or sickness arising out of the whistleblower lawsuit. The court found that "all compensatory damages awarded in the final judgment [of the whistleblower] lawsuit were expressly allocated in paragraph 4 of the settlement agreement." Accordingly, Green was required to include in gross income the $3,485,964 in payments he received under Paragraph Five of the settlement agreement for "additional damages" during the years in issue. Second, the court found that the payments made under Paragraph Six of the settlement agreement were not excludable from Green's income under § 104(a)(2) of the Code. Third, the court concluded that Green's losses and expenses resulting from Green Capital and TS Capital, were not deductible under § 162 of the Code as trade or business expenses, but instead were only deductible under § 212 of the Code as expenses related to the production or collection of income. The Court found that Green's payment of punitive damages to Allied was not deductible under either section. Finally, the court held that Green was liable for 20% accuracy-related penalties under § 6662 of the Code because he had no reasonable basis for excluding from his income the full

amount of payments under the settlement agreement. Green timely appealed the decision of the Tax Court.

## II.    STANDARD OF REVIEW

We apply the same standard of review to decisions of the Tax Court that we apply to district court decisions. Arevalo v. Comm'r, 469 F.3d 436, 438 (5th Cir. 2006). Findings of fact are reviewed for clear error and issues of law are reviewed de novo. Id. Clear error exists when this court is left with the definite and firm conviction that a mistake has been made. Streber v. Comm'r, 138 F.3d 216, 219 (1998).

## III.    ANALYSIS

Green argues the following on appeal: (1) the Tax Court erred in finding that the payments under Paragraph Five of the settlement agreement were not excludable income under § 104(a)(2) of the Code; (2) the Tax Court erred in concluding that the expenses incurred by Green in collecting the judgment and the punitive damages paid to Allied are not deductible as business expenses under § 162 of the Code; and (3) the Tax Court erred in concluding that Green was liable for 20% accuracy-related penalties. Green conceded at oral argument that the Tax Court was correct in finding that the payments received by Green under Paragraph Six of the settlement agreement were not excludable from Green's income. We address the remaining issues in turn.

A.    § 104(a)(2) and Payments Made Under Paragraph Five of the Settlement Agreement

Paragraph Five of the settlement agreement provided that "[t]he State shall fund annuities for additional damages associated with the Final Judgment" in Green's whistleblower case. (emphasis added) At issue is whether the $3,485,964 in payments for "additional damages" under Paragraph Five are excludable under § 104(a)(2) Code as "damages received. . . on account of personal injury or sickness. The Tax Court's finding that Green failed to

9

establish that payments under Paragraph Five were allocable to personal injury or sickness is a finding of fact that we review for clear error. See Robinson v. Comm'r, 70 F.3d 34, 38 (5th Cir. 1995); Srivastava v. Comm'r, 220 F.3d 353, 365 (5th Cir. 2000) ("We review the allocations made by the Tax Court only for clear error."), overruled on other grounds by Comm'r v. Banks, 543 U.S. 426 (2005).

Green argues that the payments are excludable under § 104(a)(2) of the Code. That section states, in relevant part, that "gross income does not include . . . any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injury or sickness."[6] The Supreme Court has held that amounts are excludable under § 104(a)(2) only when: (1) the underlying cause of action giving rise to the recovery is based on tort or tortlike rights; and (2) the damages were received on account of personal injury or sickness. Comm'r v. Schleier, 515 U.S. 323, 336-37 (1995); see also Chamberlain v. Unites States, 401 F.3d 335, 341 (5th Cir. 2005). To constitute damages received "on account of" personal injury, an amount must be awarded "by reason of" or "because of" personal injury, and must compensate a victim for the loss of personal or financial capital. Chamberlain, 401 F.3d at 341; see also United States v. O'Gilvie, 519 U.S. 79, 86-87 (1996). There is no dispute that the claims underlying Green's claims were tort-like, or that Green suffered personal injury. Thus, the issue is whether Green satisfied prong two's requirement that the payments under Paragraph Five for "additional damages" were received on account of Green's personal injuries or sickness.

---

[6] In 1996, Congress amended § 104(a)(2). As amended, the section excludes from gross income only damages paid on account of "personal physical injuries or physical sickness." However, the legislation included a transition rule applicable to "any amount received under a written binding agreement, court decree, or mediation award in effect on (or issued on or before) September 13, 1995." Because the parties agreed below that the pre-1996 law governed the taxability of the settlement payments at issue, we will apply that version.

When determining the tax treatment of a settlement, we must ask "in lieu of what was the . . . settlement awarded?" Srivastava, 220 F.3d at 365 (citing Knuckles v. Commissioner, 349 F.2d 610 (10th Cir. 1965)); see also Treas. Reg. § 1-104.1(c) (as amended in 1970) (defining "damages received" as "an amount received . . . through a settlement agreement entered into in lieu of [a] prosecution" of tort). Where damages are received under a written settlement agreement, "the focus is on the origin and characteristics of the claims settled in determining whether such damages are excludable under § 104(a)(2)." Pipitone v. United States, 180 F.3d 859, 862 (7th Cir. 1999); see also Francisco v. United States, 267 F.3d 303, 319 (3d Cir. 2001) ("It is a tenet of federal law that income received in settlement of a claim should be taxed in the same manner as if it had been received in court."). Therefore, to succeed Green was required to establish that the payments under Paragraph Five were made "in lieu" of damages for personal or physical injuries, not for punitive damages or economic loss. See O'Gilvie, 519 U.S. at 83 (finding that punitive damages are not "on account of" personal injuries or sickness).

We first look to the language of the agreement itself for indicia of purpose. See Greer v. United States, 207 F.3d 322, 329 (6th Cir. 2000). Where the settlement agreement lacks express language of purpose, the court looks beyond the agreement to other evidence that may shed light on the 'intent of the payor as to the purpose in making the payment.'" Id. (quoting Knuckles v. Comm'r, 349 F.2d 610, 613 (10th Cir. 1965)); see also Gadja v. Comm'r, 158 F.3d 802, 804 (5th Cir. 2005) (noting that under § 104(a)(2) intent of the employer governs treatment of a severance payment). Ultimately, the character of the payment hinges on the payor's dominant reason for making the payment. The evidence considered by the court may include the amount paid, the evidence adduced at trial, the underlying judgment, the factual circumstances that led to the agreement, and any other facts that may reveal the payor's intent. See, e.g.,

Dotson v. United States, 87 F.3d 682, 687-88 (5th Cir. 1996); Pipitone, 180 F.3d at 864-65. We heed the wisdom that "when assessing the tax implications of a settlement agreement, courts should neither engage in speculation nor blind themselves to the settlement's realities." Bagley v. Comm'r, 121 F.3d 393, 395 (8th Cir. 1997). Instead, the court should discern "the claim the parties, in good faith, intended to settle for." Dotson, 87 F.3d at 688.

The language of Paragraph Five does not resolve whether the payments were made "on account of" Green's injuries. Paragraph Five simply refers to "additional damages." This is in contrast to both of the other paragraphs— Paragraph Four payments are clearly intended to compensate Green for "loss of earning capacity, mental anguish and suffering (past) and mental anguish and suffering (future) and the payments under Paragraph Six are intended to compensate Green for "all other damages, including punitive, pre-judgment, and post-judgment interest." However, there is no such explanation of what "additional damages" this Paragraph Five was intended to compensate for. Green contends that the payments were intended to compensate him for the injuries sustained in securing payment of the judgment. The Government responds that the Paragraph Five payments were punitive damages cloaked in "other damages" language for political reasons.

Looking beyond the words of the agreement to the payor's purpose, we find that it was not clearly erroneous for the trial court to conclude that the payments made under Paragraph Five were not made to compensate Green for personal or physical injuries for the following reasons. Green claims that in refusing to acknowledge that the payments made under Paragraph Five were intended to compensate Green for personal injuries, the trial court ignored the evidence and failed to consider the testimony presented at trial. Green argues that even under the highly deferential "clearly erroneous" standard, he is entitled to relief because the evidence presented at trial conclusively established

that the money paid under Paragraph Five was intended to compensate Green for personal injuries received in attempting to collect on the judgment. This argument is not supported by the record.

First, an examination of the settlement agreement in conjunction with the jury verdict in the underlying whistleblower suit supports the Tax Court's findings. "Where there has been a judgment in a trial court that preceded the settlement of the claims, the most persuasive evidence of the payor's intent in settling the case is the previous award of that court." Francisco, 267 F.3d at 320; see also Robinson, 70 F.3d at 38 (the verdict provides "the best indication of the worth of the [taxpayer's] claims). Here, the trial court in the whistleblower litigation awarded Green $13,775,000 in damages– almost the same amount that Texas paid to Green under the settlement agreement. Further, the amount of compensatory damages awarded by the jury in the whistleblower lawsuit for the loss of earning capacity and past and future mental anguish and suffering, $3,427,999.97, mirrored exactly the amount of compensatory damages paid under Paragraph Four of the settlement agreement. The logical import, then, is that the remainder of the settlement, including the amounts paid under Paragraph Five, was intended to compensate Green for the remainder of the judgment– consisting only of punitive damages and interest.

Second, Green points to the testimony of both Potter and Augustine that Texas was opposed to paying punitive damages and wanted to minimize the amount of punitive damages paid. Thus, he argues, the damages paid under Paragraph Five could not possibly have been punitive damages, but were meant to compensate Green for the injuries he sustained in his attempts to collect. However, viewing the testimony presented at the trial as a whole, it appears that although the Paragraph Five payments were intended to satisfy the punitive damages portion of the judgment, they were labeled otherwise because of political considerations. Potter testified that neither he, nor his office, had

13

undertaken any independent investigation of Green's injuries and that he lacked personal knowledge of Green's injuries resulting from his efforts to collect the judgment. Potter also testified that Paragraph Five "could have been the same type of [damages] as paragraph four." This testimony undercuts Green's assertion that the Paragraph Five payments were intended to compensate for post-judgment injuries. Further, Potter explained that Texas's opposition to paying punitive damages "was pretty much a matter of public policy." Thus, given the political climate, along with Potter's lack of knowledge of Green's post-judgment injury, the Tax Court did not err in finding that the Paragraph Five payments were intended to satisfy a portion of the punitive damages and interest awarded to Green, but were labeled otherwise.

Third, Green points to Bullock's knowledge of his post-judgment injuries in support of his argument that Paragraph Five was intended to compensate him for these injuries. The testimony of Green, Fogg, and Augustine established that Bullock was aware of Green's hardship and health problems stemming from the collection efforts. Very likely, it was these compelling facts which led Bullock to help Green obtain satisfaction of the judgment in the first place. However, Bullock was not responsible for negotiating the settlement or drafting the settlement agreement. Green did not produce any evidence that Bullock informed Potter about Green's postjudgment injuries, and in fact, Potter testified that he was unaware of any postjudgment injuries. Bullock's knowledge of Green's health condition does not satisfy Green's burden of establishing that Texas intended the money paid under Paragraph Five to compensate Green for personal injury or sickness.

Finally, Augustine testified that his intent was to obtain from Texas full payment of the punitive damages and interest. Fogg testified that in his meeting with Bullock, he told Bullock that he expected Green to get a minimum of what was owed to him by the jury verdict. Both of these statements confirm

that the overall goal of the settlement negotiations and eventual agreement was to provide Green with a monetary settlement equal to the judgment entered against the state.

We agree with the Tax Court's conclusion that "the record lacks any evidentiary basis for concluding that a specific portion of the [Paragraph Five] annuity was allocable to any personal injury or sickness." Admittedly, the language used in Paragraph Five is less than clear. But it is Green who bears the ultimate burden of proving that the amounts paid under Paragraph Five were meant to compensate him for personal injuries or sickness. He has not met that burden. As such, the payments made under Paragraph Five of the settlement agreement are not excludable under § 104(a)(2).

B.    Deductibility of Business Expenses and Punitive Damages Paid to Allied

Green appeals the Tax Court's determination that the expenses and losses he incurred in connection with Green Capital and TS Capital are not deductible under § 162 of the Code as "ordinary and necessary expenses paid or incurred . . . in carrying on any trade or business."[7] The Commissioner concedes that Green substantiated the underlying expenses, but argues that they were deductible only as "ordinary and necessary expenses paid or incurred . . . for the production or collection of income" under § 212(1) of the Code.

Section 162 of the Code permits a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162. In contrast, deductions are allowed under § 212 for "the ordinary and necessary expenses paid or incurred during the

---

[7] It is more favorable for a taxpayer to deduct expenses under § 162. Expenses deducted under § 162(a) generally are subtracted in full from gross income to arrive at adjusted gross income. However, expenses deducted under § 212 ordinarily are subtracted from gross income to arrive at taxable income and are subject to certain floor limitations set out in § 67(a) of the Code. Also, under § 56(b) of the Code, a deduction under § 212 may be limited by application of the alternative minimum tax.

taxable year . . . for the production or collection of income." 26 U.S.C. § 212. A deduction claimed under § 212(1) "must meet the same requirements applicable to trade or business expenses under § 162, except that the person claiming the deduction need not be in the trade or business." Simon v. Comm'r, 830 F.2d 499, 501 (2d Cir. 1987)); Snyder v. United States, 674 F.2d 1359, 1364 (10th Cir. 1982) (same). The purpose of § 212 is to provide for deductions in "those pecuniarily motivated or profit seeking activities which are neither the conduct of the taxpayer's trade or business on the one hand nor the mere satisfactions of his needs as a human and those of his family on the other." Petschek v. United States, 335 F.2d 734, 735 (2d Cir. 1964).[8]

In order to be engaged in carrying on a trade or business, the taxpayer "must be involved in the activity with continuity and regularity and . . . the taxpayer's primary purpose for engaging in the activity must be for income or profit." Comm'r v. Groetzinger, 480 U.S. 23, 35 (1987). The concept of trade or business is a "concept which falls far short of reaching every income or profit making activity." Whipple v. Comm'r, 373 U.S. 193, 202 (1963). A sporadic activity, a hobby, or an amusement does not qualify as a "trade or business." Groetzinger, 480 U.S. at 35. The determination of whether Green was engaged in carrying on a trade or business is a determination of fact that we review for clear error. See Westbrook v. Comm'r, 68 F.3d 868, 874 (5th Cir. 1995); Jackson v. Comm'r, 864 F.2d 1521, 1524 (10th Cir. 1989).

---

[8] Congress's purpose in enacting § 212 was to put all income producing activities on equal footing. United States v. Gilmore, 27 U.S. 39 (1963). Thus, at the time the predecessor to § 212 was adopted, deductions under § 162 and § 212 had the same effect. Id. However, beginning in 1986, Congress distinguished between the two, limiting the deductibility of non-business expenses. The rationale was that some of the § 212 expenses had only a very tenuous relationship to any income-producing activity and had personal-consumption benefits as well. See Leah Witcher Jackson, Won the Legal Battle, but at What Tax Cost to Your Client: Tax Consequences of Contingency Fee Arrangements Leading up to and After Commissioner v. Banks, 57 Baylor L. Rev. 47, 110-12 (2005).

The Tax Court found that although Green "continuously and regularly engaged in the activity of attempting to recover his judgment between 1991 and 1995," it "could not conclude that [Green] was in a trade or business in the customary use of those terms." The Tax Court reasoned that "[a]lthough a trade or business requires continuous and regular activity, continuity and regularity do not, standing alone, constitute a trade or business." The Tax Court's conclusions are well-supported by the record in this case. Green's asserted purpose in forming Green Capital and TS capital, as noted by the Tax Court "was to secure the compensation to which he was entitled." While Green's attempt to secure satisfaction of this personal judgment qualifies as an income seeking activity; it does not qualify as a business or trade. Expenditures may only be deducted under § 162 "if the facts and the circumstances indicate that the taxpayer made them primarily in furtherance of a bona fide profit objective independent of tax consequences." Copeland v. Comm'r, 290 F.3d 326, 335 (5th Cir. 2002). Here, the record demonstrates that Green formed the two companies solely for the purpose of paying expenses associated with the collection of a judgment that was rendered prior to the establishment of the businesses. Further, the businesses had no independent purpose beyond the payment of these legal expenses. Were we to find that the funneling through a business of Green's expenses in collecting a personal judgment were sufficient to meet the requirements of § 162, the distinction between § 162 and § 212 would be abrogated. The Tax Court did not clearly err in determining that Green's expenses and losses from Green Capital and T.S. Capital were not incurred in carrying on any trade or business. Cf. Alexander v. IRS, 72 F.3d 938 (1st Cir. 1995) (expenses incurred by employee in settling post-termination lawsuit not deductible as independent business expense because lawsuit proximately resulted from his employment).

Additionally, Green argues that the $365,000 portion of his payment in satisfaction of Allied's judgment, constituting exemplary damages, is deductible under § 162. This judgment was entered against Green for non-payment of expenses associated with collection of the judgment. Punitive damages may be deductible under § 162 as a business expense, but only to the extent that such expense is "ordinary and necessary" and is incurred in connection with a "trade or business." Tax Court found that the punitive damages payment was not deductible because Green failed to explain the basis of the award against Green or show that the expense was ordinary or necessary. Green has not demonstrated that this conclusion was clearly erroneous. As such, we affirm that Tax Court's holding that Green's punitive damages payment is not deductible under § 162.

## C.    Accuracy-Related Penalties

Green appeals the Tax Court's affirmance of the Commissioner's assessment of accuracy-related penalties under § 6662 of the Code on Green's income tax returns from 1995 through 1999. The determination of whether Green acted with reasonable cause and in good faith in making a substantial understatement of tax liability is a factual issue that we review for clear error. Srivastava, 220 F.3d at 367; see also Treas. Reg. § 1.6664-4(b)(1) (as amended 2003) ("The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances.")

Under § 6662 of the Code, a taxpayer may be liable for a penalty of twenty percent on the portion of underpayment of tax due to "any substantial understatement of income tax." 26 U.S.C. § 6662 (b)(2). A "substantial understatement" is defined as an understatement of tax liability on a tax return that exceeds the greater of (1) 10% of the tax required to be shown on the return

for the taxable year; or (2) \$5,000.  26 U.S.C. § 6662 (d)(1)(A), (d)(2).[9]  This penalty does not apply to any portion of an underpayment if the taxpayer shows "that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  26 U.S.C. § 6664(c)(1); see also Higbee v. Comm'r, 116 T.C. 438, 488 (T.C. 2001).

For the reasons discussed above, Green's failure to pay tax on the settlement payments and his deduction of the business expenses and losses were in error.  He argues however, that the Tax Court erred in upholding the penalties because he acted in good faith and with reasonable cause.

The Tax Court found that Green did not act with reasonable cause and good faith.  It found that Green was negligent in excluding the entire settlement recovery from his income, while, at the same time, deducting in full the expenses he incurred to collect the whistleblower judgment.  Further, the Tax Court found that Green's inclusion of the Paragraph Six payments in 1996, 1997, and 1998 indicated his knowledge that punitive damages and interest were not excluded under § 104 of the Code.  The Tax Court also found that, although Green had assistance in preparing his return in 1997 and 1998, there was no evidence as to what Green told the preparer, what the preparer told Green, and whether or not Green's reliance on any advice from the preparer was reasonable.

Based on all of the facts and circumstances, it was not clear error for the Tax Court to find that Green failed to act with reasonable cause and good faith.

---

[9] Section 6662 provides that taxpayers may reduce the amount of an understatement, and hence the penalty imposed, by that portion of the understatement resulting from a position taken by the taxpayer for which there was substantial authority or, if the position is disclosed adequately on the tax return, for which there was a reasonable basis for such treatment. 26 U.S.C. § 6662(d)(2)(B)(i)-(ii).  The Tax Court found that Green failed to establish that he was entitled to the benefit of either of these provisions.  On appeal, Green does not appear to argue that the Tax Court erred in this respect, but to the extent that he does, his argument is rejected.

We sustain the assessment of penalties for 1996 through 1999 for the substantial understatement of tax and for 1995 through 1999 for the disallowed deductions.

 IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the Tax Court's determinations that: (1) the payments made under Paragraph Five of the settlement were not excludable under § 104(a)(2) of the Code; (2) Green was entitled to deduct expenses and losses related to Green Capital and TS Capital under § 212 of the Code, and not under § 162 of the Code, and that Green was not entitled to deduct the payment of punitive damages to Allied; and (3) the Tax Court's affirmance of the accuracy-related penalties was not in error.