## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 16, 2009

Charles R. Fulbruge III
Clerk

No. 08-60449

RICHARD A PRUDHOMME; CATHY G PRUDHOMME

Petitioners-Appellants

v.

COMMISSIONER OF INTERNAL REVENUE

Repondent-Appellee

Appeal from the United States Tax Court

Before HIGGINBOTHAM, GARZA, and PRADO, Circuit Judges.

PER CURIAM:[*]

Sometimes, the resolution of a case on appeal turns largely on the standard of review. This is one of those cases.

Petitioners-Appellants Richard and Cathy Prudhomme (the "Prudhommes") appeal the United States Tax Court's decision that they are liable for an accuracy-related penalty for underpaying their taxes. We must determine whether the Prudhommes can avoid the penalty because they acted in "good faith" and with "reasonable cause," per I.R.C. § 6664(c)(1), when relying on their accountants to prepare their tax return. The Tax Court held that the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Prudhommes did not meet this standard because they provided their accountants with insufficient information to prepare the tax return accurately and did not make a reasonable effort to assess their proper tax liability. Given that there is evidence that cuts both ways, we cannot say that the Tax Court clearly erred in its factual findings. Therefore, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1981, the Prudhommes, who both have high school educations, formed Bronco Oilfield Services, Inc. ("Bronco"), a family business. Richard Prudhomme worked in the field and Cathy Prudhomme maintained the office. The business was quite successful, and in 2003 they sold the company to RPC, Inc. for almost $11 million. They received $5,490,579 in cash at the closing, a promissory note of $3,500,000, and $2,000,000 in RPC's stock. The proceeds from the sale of Bronco form the basis of the Prudhommes' individual tax liability at issue in this case.

For the past fourteen or fifteen years, the Prudhommes have used the services of CPA Jon Hurt ("Hurt") and his firm to prepare both Bronco's and their individual tax returns. Alice Vaughan ("Vaughan"), an accountant with Hurt's firm, handled both accounts. Vaughan prepared Bronco's 2003 tax return, which reflected the sale of the company to RPC. Hurt reviewed and signed the tax return as the "preparer," and Cathy Prudhomme signed and filed it on March 15, 2004. However, subsequent to completing the Bronco return, Vaughan took a leave of absence from Hurt's firm to care for her ailing husband. Hurt then assigned the Prudhommes' personal tax return to another CPA in his office, Dwayne Whitley ("Whitley"), and notified Cathy Prudhomme of this switch. The tax return Whitley prepared reflected an adjusted gross income for 2003 of $2,194,666, which was a significant increase over the Prudhommes' adjusted gross income in 2002 of $216,534. Most of this increase stemmed from the sale of Bronco. Cathy Prudhomme picked up the Prudhommes' personal tax

return from Hurt on October 15, 2003—the day it was due after the Prudhommes had received extensions—but did not review it before signing it on behalf of herself and her husband and mailing it in.

After determining that the Prudhommes may have underpaid their 2003 taxes, the Internal Revenue Service ("IRS") began an audit. In preparing for a meeting with the revenue agent, Hurt noticed that the Prudhommes' individual return failed to include some of the proceeds they received from the sale of Bronco. Specifically, when comparing the Bronco return with the individual return, Hurt observed that the Bronco return correctly reflected an expense of $3.2 million but that this income was missing from the Prudhommes' individual return. Hurt testified, "And in the transfer [of the Prudhomme account to Whitley] some of the information did not get, you know, transferred properly. And I'm embarrassed to say this, I mean it's, you know, it's our fault. We basically just screwed up is what happened and didn't get the income transferred." The Prudhommes then paid $576,728 in additional taxes on November 28, 2005. As Hurt explained,

> In fact, you know, when they got picked for an audit, that Saturday before the guy was coming on Monday I looked over and I saw it bigger than Dallas, it was just like, oh man, this is just—you know, this is going to be embarrassing. And I went right to the agent and told him. I mean it wasn't like anything was hidden, anybody tried to pull a fast one or anything like that. And, you know, and I brought it to his attention right off the bat and, you know, and told him we need to pick this up, we need to pay income on it. I mean the Prudhommes as soon as they got the report they paid within a week or so. I mean, you know, it's just an error.

In justifying her reliance on the Hurt firm to prepare the Prudhommes' taxes, Cathy Prudhomme stated that the tax return would not have made sense to her. She testified, "I wouldn't have known where the $[3.2] million went in this tax return, if it was back in the back or where. I don't know where the income is on this tax return. I don't know where that would have showed up."

3

Further, the Prudhommes observe that the return itself was complicated, spanning thirty-three pages and including nine schedules.

The Prudhommes also assert that they notified the Hurt firm of the sale of Bronco, thereby deflecting the blame for their mistake in failing to declare some of the proceeds they received from the sale. In particular, the Prudhommes provided Vaughan with a document titled "Payouts at Closing," which describes the income from the sale of Bronco. That document reflects a cash payment from the buyer, RPC, of $5,490,579. The document then designates the allocation of that amount: $4,059,735 to Bronco, $406,579 to the Prudhommes, and $1,024,265 to loans. Thus, the document reflects the total proceeds from the sale, meaning that an accountant preparing both Bronco's and the Prudhommes' taxes would have to account for the full amount, but it does not state explicitly that the Prudhommes received additional payments from Bronco stemming from the sale.

Five weeks after the audit, the IRS issued a Notice of Deficiency, declaring that the Prudhommes owed $576,728—the additional taxes they had already paid—as well as $143,976.28 in "additions to tax." Specifically, the IRS determined that the Prudhommes owed $28,565.70 for failing to file their income tax on time under I.R.C. § 6651(a)(1), $64.98 for underpaying their estimated tax under I.R.C. § 6654, and $115,345.60 for negligence or a substantial understatement of tax under I.R.C. § 6662.

The main basis for the IRS's imposition of the addition to tax under I.R.C. § 6662 was its determination that the Prudhommes received proceeds from the sale of Bronco but did not notify their accountants or declare the extra income on their tax return. The IRS notes that the Prudhommes made three deposits to their bank account, which reflected payments from Bronco to the Prudhommes stemming from the sale, but that their tax return did not account

4

for the last deposit of $3.2 million.[1] The IRS claims that if the Prudhommes had furnished their accountants with their bank statements, the accountants would have noticed the additional $3.2 million proceeds from the sale of Bronco and would have adjusted the Prudhommes' individual tax return accordingly. Moreover, the IRS observes that the Prudhommes did not have Bronco issue them a Form 1099-DIV to reflect the $3.2 million dividend they received from the sale.

The Prudhommes petitioned the Tax Court for a redetermination of their tax liability, challenging the imposition of some of these penalties. As noted above, they conceded and paid the underlying tax deficiency before trial. They also conceded the $64.98 addition to tax for failure to pay their estimated tax. Therefore, the Tax Court considered only two issues: (1) whether the Prudhommes were liable for an addition to tax for failure to timely file their return and (2) whether they were liable for a penalty for the substantial understatement of tax. After a bench trial, the Tax Court ruled for the IRS on both issues.

The Prudhommes do not challenge the Tax Court's ruling on their failure to timely file. As to the second issue, the Tax Court found that the Prudhommes substantially understated their tax liability under I.R.C. § 6662(b)(2). The court also determined that the Prudhommes did not have reasonable cause for, or act in good faith with respect to, the underpayment. The Tax Court therefore sustained the addition to tax. The Prudhommes appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

The Tax Court had jurisdiction under I.R.C. §§ 6213(a) and 7442. This court has jurisdiction under I.R.C. § 7482(a)(1).

This court reviews the Tax Court's findings of fact for clear error and legal

---

[1] The IRS clarifies that the deposit was actually for $3.9 million but that the Prudhommes returned $700,000 to Bronco, for a net deposit of $3.2 million.

conclusions de novo. *Green v. Comm'r*, 507 F.3d 857, 866 (5th Cir. 2007). Whether a taxpayer acted with reasonable cause and in good faith is a question of fact. *Id.* at 871; *see also* Treas. Reg. § 1.6664-4(b)(1). "Clear error exists when this court is left with the definite and firm conviction that a mistake has been made." *Green*, 507 F.3d at 866.

## III. DISCUSSION

Section 6662 of the Internal Revenue Code provides that a taxpayer is liable for a penalty of 20% of any underpayment of tax due to, inter alia, a substantial understatement of tax. I.R.C. § 6662(a), (b)(2). The Prudhommes concede that their 2003 return included a substantial understatement of income tax. *See id.* § 6662(d)(1) (providing that "there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of—(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $ 5,000"). There is, however, an exception to this penalty. Section 6664(c)(1) states that "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." *Id.* § 6664(c)(1).

The Treasury regulations provide that "[t]he determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b). "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." *Id.* The regulations also state that a court must consider whether the taxpayer made "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.* That is, even if a taxpayer relies on an expert, the court still must take into account "[a]ll facts and circumstances" regarding whether that

reliance was reasonable and in good faith, including the "taxpayer's education, sophistication and business experience." *Id*. § 1.6664-4(c)(1).

This court has repeatedly confirmed that "'the extent of the taxpayer's effort to assess [his] proper tax liability' is '[g]enerally[] the most important factor' in determining reasonable cause and good faith." *Stanford v. Comm'r*, 152 F.3d 450, 460-61 (5th Cir. 1998) (quoting Treas. Reg. § 1.6664-4(b)) (alterations in original); *accord Streber v. Comm'r*, 138 F.3d 216, 223 (5th Cir. 1998). We have also observed that "[i]f a taxpayer is able to show that there was a reasonable cause for the understatement and good faith, which may stem from reasonable reliance on the advice of [a] professional, the I.R.S. may waive the understatement penalty." *Streber*, 138 F.3d at 222. Reliance on a tax professional, however, must be *reasonable*, and simply relying on a professional is not dispositive; for instance, the court in *Green* upheld the imposition of an addition to tax even though the taxpayer consulted a professional because "there was no evidence as to what Green told the preparer, what the preparer told Green, and whether or not Green's reliance on any advice from the preparer was reasonable." *Green*, 507 F.3d at 872; *see also* Treas. Reg. § 1.6664-4(b)(1) ("Reliance on an information return or on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith.").

Thus, we must balance several considerations in determining whether a taxpayer can avoid an addition to tax based upon the taxpayer's reliance on a tax professional. On the one hand, as we have explained, "'[t]o require the taxpayer to challenge the [expert], to seek a "second opinion," or to try to monitor [the expert] on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.'" *Chamberlain v. Comm'r*, 66 F.3d 729, 733 (5th Cir. 1995) (quoting *United States v. Boyle*, 469 U.S. 241, 251 (1985)) (second and third alterations in original)); *see also Heasley*

*v. Comm'r*, 902 F.2d 380, 384-85 (5th Cir. 1990) (explaining that "due care does not require moderate-income investors such as the Heasleys to independently investigate their investments[, because] [t]hey may rely on the expertise of their financial advisors and accountants"). On the other hand, reliance on a professional is not reasonable "if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item." Treas. Reg. § 1.6664-4(c)(i); *see Srivastava v. Comm'r*, 220 F.3d 353, 367 (5th Cir. 2000) (rejecting argument that the taxpayers reasonably relied upon a professional because, inter alia, they never gave their accountant a copy of the settlement agreement subject to the tax), *overruled on other grounds by Comm'r v. Banks*, 543 U.S. 426 (2005).

When we have reversed the imposition of an addition to tax for a substantial underpayment, we have often looked to the taxpayer's lack of experience, knowledge, or education. For example, in *Heasley*, we noted that the taxpayers were blue collar workers who had done little investing and had not graduated from high school, although one of the taxpayers had earned a G.E.D. and some college credits. 902 F.2d at 381, 385. We found that, given their circumstances, it was reasonable for them to rely on a CPA to complete their taxes after undertaking a new, complicated investment. *Id.* at 385. We stated, "If neither [their financial consultant for the investment] nor their C.P.A. found anything wrong with the investment, how could the [taxpayers]?" *Id.* Similarly, this court in *Streber* reversed the imposition of the substantial understatement penalty, highlighting the fact that the taxpayers in question, two sisters in their twenties, were young and inexperienced in business. 138 F.3d at 223.

In weighing these factors in this case, the Tax Court concluded that there was no reasonable cause for the error and that the Prudhommes did not act in good faith. First, the court determined that the Prudhommes' reliance on the Hurt firm was not reasonable, because they did not fully inform Whitley, the

accountant who ultimately prepared their 2003 personal tax return, of all facets of their finances. The court noted that Whitley testified that he had only a "vague" notion of the sale of Bronco. The court stated that the Prudhommes should have furnished Whitley with bank records, a Form 1099-DIV from Bronco, or other documentation of the sale. Second, the court concluded that the Prudhommes did not make a good faith effort to assess their correct tax liability. The court noted that Richard Prudhomme did not even read or sign the return, that Cathy Prudhomme did not verify that all income from the sale of Bronco was on the return, and that both Prudhommes were not unsophisticated taxpayers but were successful business people.

On appeal, we must make a similar factual determination regarding whether there was reasonable cause and good faith, but we must do so under the guise of the clear error standard of review. Indeed, were we reviewing the Tax Court's decision de novo, we might question some of the Tax Court's factual findings, particularly given Cathy Prudhomme's testimony about her confusion surrounding the tax return, Hurt's testimony in which he took full responsibility for the mistake, and the unique situation of a different accountant preparing the Prudhommes' individual return. But "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). We cannot say that we are "left with the definite and firm conviction that a mistake has been made," *Green*, 507 F.3d at 866, as there is certainly evidence to support the Tax Court's decision. In particular, the Prudhommes did not explicitly notify Whitley of the sale of Bronco or ask how that sale would affect their personal taxes. They also did not check themselves, or ask Hurt or Whitley to verify, that the tax return included all of the proceeds from the sale of Bronco. Nor did they give the Hurt firm any specific documents detailing the $3.2 million deposit. Although an accountant completing both Bronco's and the Prudhomme's taxes likely would

9

have allocated all proceeds listed in the "Payouts at Closing" document, that document did not reflect Bronco's $3.2 million payment to the Prudhommes. The Prudhommes therefore should have ensured that Whitley, who had just taken over their account, knew about the $3.2 million payment. Finally, the Prudhommes are not young, unsophisticated taxpayers, as in *Heasley*, 902 F.2d at 385, and *Streber*, 138 F.3d at 223, but are successful business people. Although the fact that they were not tax experts and always used a professional to complete their taxes cuts the other way, the Tax Court's conclusion is not without support.

In sum, given that we must review the Tax Court's factual findings only for clear error, we must affirm. The standard of review constrains us from substituting our own judgment for that of the Tax Court, which heard all of the testimony and is better suited to determine the credibility of witnesses and make factual findings. Because there is support in the record for the Tax Court's findings, those findings cannot, by definition, be clearly erroneous. *See Anderson*, 470 U.S. at 574.[2]

---

[2] The Prudhommes also assert that the Tax Court erred as a matter of law by failing to cite cases from this circuit. This argument lacks merit. The Tax Court identified the correct legal standard, even if it cited other Tax Court cases and the Treasury regulations instead of Fifth Circuit cases for support. For example, the Prudhommes take issue with the Tax Court's statement that "the taxpayer remains responsible for reading and reviewing the return to verify that all income items are included" and that "[t]he taxpayer may have to bear the consequences of any negligent errors committed by his or her agent." This is merely an extrapolation of this court's rule that a taxpayer must make an effort to assess his or her tax liability and can rely upon the advice of a professional only if that reliance is reasonable. *See Green*, 507 F.3d at 872. It is not a stretch to suggest that one aspect of reasonable reliance is reading and reviewing the return and remaining responsible for any errors. Additionally, the Prudhommes misread the Tax Court's language by suggesting that the court required them to double check every item on their tax return, when the court instead simply mentioned that they had a responsibility to review the return (as opposed to verifying every entry), especially when the return should reflect a large and unique transaction. Accordingly, we find no basis for holding that the Tax Court made any legal errors in determining whether the Prudhommes are liable for an addition to tax. Indeed, although they couch their argument as a challenge to the legal standard the Tax Court applied, the Prudhommes in reality take issue with the Tax Court's application of that standard to the facts at hand. This appeal therefore turns on

## IV. CONCLUSION

There is support in the record for the Tax Court's conclusion that the Prudhommes did not act in "good faith" and with "reasonable cause" in relying on their accountants to prepare their taxes. Accordingly, the Tax Court did not clearly err. We AFFIRM the Tax Court's decision.

AFFIRMED.

---

the Tax Court's factual findings. As discussed in detail above, the Tax Court did not clearly err.