T.C. Memo. 1997-331


UNITED STATES TAX COURT


WILLIAM N. AND MOIRA M. CARLSTEDT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2418-96.                    Filed July 22, 1997.


On the facts, <u>Held</u>:  Ps have failed to sustain
their burden of proving that H did not materially
participate in the activity of CDI during 1990 and 1991
within the meaning of sec. 469(h)(1), I.R.C., and sec.
1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed.
Reg. 5725 (Feb. 25, 1988), and consequently Ps may not
offset certain undisputed passive losses against their
share of income from CDI for those years.


<u>Ronald M. Soskin</u> and <u>Stephen E. Arthur</u>, for petitioners.[*]

<u>Ronald T. Jordan</u>, for respondent.

---

[*] A brief amicus curiae was filed by <u>Richard M. Lipton</u> and
Adam Grais as attorneys for the National Realty Committee.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, <u>Judge</u>[1]:  Respondent determined deficiencies in the Federal income tax of petitioners, William N. Carlstedt and Moira M. Carlstedt, in the amounts of $180,351 and $183,550, for the taxable years ended December 31, 1990, and December 31, 1991, respectively.  (The term petitioner will be used henceforth to refer to William N. Carlstedt.)

All section references are to sections of the Internal Revenue Code in effect for the years at issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by petitioners, the issues for decision are as follows:

1.  Whether petitioner engaged in the activity of Carlstedt Dickman, Inc. (CDI) for 500 hours or less in both 1990 and 1991, such that petitioner did not materially participate in CDI pursuant to section 469 and temporary regulations thereunder; and, if so,

2.  Whether section 1.469-2T(f)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5721 (Feb. 25, 1988), is invalid on its face

---

[1]  With the consent of counsel for the parties, the Chief Judge reassigned this case, after the death of Judge Irene F. Scott, to Judge Arthur L. Nims, III, for disposition on the existing record.

or as applied to petitioners, resulting in respondent's incorrect characterization of petitioners' income from CDI as nonpassive.

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners are married and resided in Indianapolis, Indiana, at the time they filed their petition in this case.

## FINDINGS OF FACT

During the years at issue, petitioner was a shareholder or partner in the following real estate-related enterprises: (1) CDI; (2) Citimark Development Co. (Citimark); (3) Citimark Management, Inc. (CMI); (4) Citimark Communications, Inc. (CCI); and (5) Monaghan Leasing Co. (Monaghan).

### Carlstedt Dickman, Inc.

CDI, an Indiana corporation, is a general contractor that provides design and building services, including construction management, to retail, industrial, and health care companies. CDI had an election in effect to be treated as an S corporation during the years at issue. The net income of CDI in 1990 and 1991 was $892,765 and $745,803, respectively.

Petitioner has been president, a director, and a shareholder of CDI since its founding in 1982. Petitioner's wife (Mrs. Carlstedt) was also an officer and director of CDI in 1990 and 1991. During the years at issue, petitioner owned 80 percent of the stock of CDI, and Michael Dickman (Dickman), vice president

of CDI, owned 20 percent of the stock.  Petitioner was paid a salary by CDI in 1990 and 1991 in the amounts of $93,885 and $74,130, respectively.

CDI earned its gross income in 1990 and 1991 from two sources.  Approximately 93 to 95 percent of its income was derived from commercial construction contracts obtained through a competitive bidding process.  CDI earned the remaining 5 to 7 percent of its income from the construction of leasehold improvements (tenant finishes) for unrelated third parties, as well as for tenants in buildings owned by Citimark.

In 1990 and 1991, petitioner engaged in a number of activities on CDI's behalf.  He met with CDI project managers (Kenneth Johnson and John Cook) and superintendents and, occasionally, with the company's estimators.  Petitioner held formal company meetings and field meetings concerning the general business of CDI.  He held secretary meetings and accounting staff meetings.  He met with CDI's bonding and insurance companies.  Petitioner also prepared for and made project presentations to certain prospective customers.  He occasionally discussed project bid markups with Dickman.  Petitioner made decisions regarding the legal affairs of the company and met or spoke with CDI's attorneys to discuss such matters.  Petitioner also made occasional site visitations in connection with projects under construction.

Petitioner was in charge of hiring, firing, and evaluating key personnel. He reviewed and signed contracts for construction jobs and handled any miscellaneous nonrecurring matters related thereto. Petitioner reviewed company correspondence and made phone calls relating to the business of CDI. He also handled miscellaneous administrative office matters, such as purchasing athletic equipment and office furniture for the company. Petitioner signed checks for CDI and engaged in entertainment and other activities related to business development. In addition to the above, in 1991 petitioner was also involved in insurance claim matters and tenant finishes.

Although nominally an employee of CMI, Mrs. Carlstedt also participated in activities on CDI's behalf. In 1990, Mrs. Carlstedt submitted reports for reimbursement of expenses for a number of different items of travel and/or entertainment incurred for CDI. In addition, Mrs. Carlstedt was partially responsible for distributing to employees of CDI tickets purchased by CDI to Indianapolis Colts and Pacers games, Indianapolis 500 Festival activities and other entertainment activities.

The Citimark Partnerships

Petitioner was also involved in the real estate development business in 1990 and 1991. In the mid-1980's, CDI had constructed 10 buildings on two parcels of land (Allison Pointe and Castleton Business Park) located in northeast Indianapolis. Each of the 10 buildings was owned by a separate partnership in

which petitioner held an interest as a general partner. (Another partnership owned the land in Allison Pointe.) The manner in which the partnerships were set up to own the different properties was common in the real estate industry.

Petitioner's principal partners in each of the partnerships were Dickman, Roger Eiteljorg, and Jim Eiteljorg. Petitioner was managing general partner of each of the partnerships. For the sake of simplicity, the partnerships operated collectively under the name of Citimark. Citimark is not a legal entity and earns no income. For marketing purposes, petitioner was represented as the president of Citimark. Similarly, Dickman, Jim Eiteljorg, and Roger Eiteljorg held themselves out as senior vice presidents of Citimark.

The partnerships were initially financed with short-term construction loans that enabled them to build the projects and lease them up to a point. By 1990 and 1991, the partnerships had amassed approximately $50 million of debt as a result of short-term financing, approximately $40 million of which was due in December 1991. The partners, including petitioner, had assumed personal liability for the $40 million of loans due as a condition of obtaining the financing. As managing general partner, it was one of petitioner's responsibilities to find a source to refinance the construction loans in the form of long-term mortgages.

Citimark Management, Inc.

During the years at issue, petitioner was also president of CMI, an Indiana corporation established in 1982, which had in effect an election to be treated as an S corporation. CMI entered into agreements with Citimark to provide property management services to the buildings owned by the partnerships. Mrs. Carlstedt was secretary of CMI, as well as a property manager. CMI also employed leasing agents whose job it was to find prospective tenants for Citimark-owned buildings.

Citimark Communications, Inc.

CCI is an Indiana corporation formed by petitioners in 1989. In 1990 and 1991, petitioner owned 32 percent of the stock of CCI and was treasurer and a director of the company. James Eiteljorg, Roger Eiteljorg, Dickman, and David Berry owned the balance of the stock and, with the exception of Dickman, were officers of the company. CCI had elected to be treated as an S corporation during the years in issue.

In 1990 and 1991, CCI sold telecommunications services and equipment both to third parties and to tenants housed in the buildings owned by the Citimark partnerships. CCI had two full-time employees; neither of the petitioners was a full-time employee of that corporation.

Monaghan Leasing Co.

Monaghan is a leasing corporation owned by petitioner and Dickman; petitioner was its president. Monaghan acquires construction and other equipment and leases it to CDI and the other enterprises. Monaghan had no employees in 1990 and 1991.

Throughout the years at issue, the offices of CDI and petitioner's other businesses were all located in a single office suite at Allison Pointe, in one of the buildings owned by the partnerships. Petitioner occupied one office in this suite from which he conducted all of his business activities. Petitioner stated that "if you walked into our office there wouldn't be divisions between each of these companies and it would be difficult for you to tell who worked for who". The businesses all shared the same phone lines. Rent was allocated among the businesses based on a square-foot analysis of the space each business utilized. None of the cost of the space, however, was allocated to the partnerships.

Expenses for all of the above-described entities were generally paid through CDI. This was viewed as the most efficient way to handle accounting and invoicing for the entities collectively. Expenses were then generally allocated to a specific company or partnership by CDI's accounting department.

During 1990 and 1991, CDI wrote 3,863 and 4,088 checks, respectively, for business expense disbursements. Either petitioner or Mrs. Carlstedt, in petitioner's absence, signed all of the checks, as petitioners had sole signature authority on CDI's bank accounts. The checks were prepared by the accounting department, and related invoices and payment vouchers were attached thereto before the checks were presented for signature. On occasion, petitioner returned checks to the accounting department for further explanation before signing them. For example, on or about February 12, 1991, petitioner returned a check to the accounting department for an explanation concerning an $88.25 expenditure.

### Petitioner's Partnership Activities in 1990 and 1991

During 1990 and 1991, a number of Citimark tenants went bankrupt, and other partnership tenants were dilatory in their payment of rent. Moreover, the availability of long-term refinancing in the real estate market had become increasingly scarce during this period. These developments affected the partnerships significantly. Approximately $500,000 of interest payments were due each month on the short-term loans, and the partnerships also faced the prospect of having to repay the principal of $40 million in December 1991.

In an attempt to secure long-term financing, petitioner developed numerous information packages valuing the buildings for potential lenders. These packages also included background information about the partnerships. Petitioner, along with Roger Eiteljorg, contacted roughly 100 financial institutions each year on behalf of the partnerships in an attempt to find long-term financing. Many were contacted twice. Approximately 80 pension funds and 27 life insurance companies were also contacted in this manner. Petitioner's efforts to refinance the partnerships occupied much of his time, both in 1990 "and especially in '91".

Petitioner's Estimations of Time Spent on CDI Activities in 1990 and 1991

In mid-1990, petitioner's accountant informed him of the possibility of offsetting his share of the partnerships' passive losses against his income from CDI if petitioner were to spend less than 500 hours on CDI activities for the year. The accountant advised petitioner to keep a reasonable record of his time, and to review his activities for the months in 1990 that had already passed.

Petitioner maintained a contemporaneous calendar of a portion of his time and activities during the years in issue. For 1990, petitioner listed activities on his calendar related to CDI and the partnerships totaling 641 hours. Of that amount,

179.5 hours related to activities that petitioner determined involved CDI and 461.5 hours related to activities that petitioner determined involved the partnerships.  In 1991, petitioner's calendar listed activities related to CDI and the partnerships totaling 620 hours.  Of that amount, 257 hours related to activities that petitioner determined involved CDI and 363 hours related to activities involving the partnerships.

At the end of each year, petitioner also summarized the available records of his time into a so-called diary of activities (the diaries).  Petitioner's diaries were based on a 40-hour week, although petitioner acknowledged that he generally had worked more hours than that per week.  In preparing the diaries, petitioner calculated the total number of hours he had spent on CDI and his other enterprises.  In so doing, he used his calendar to remind him of the occurrence and length of meetings, reviews, trips, as well as any site visits.  He then examined other available documents to provide allowances for phone calls, travel and entertainment, and activities not otherwise listed on his calendar.  Petitioner testified that he included a "cushion" of 30-40 hours of additional time worked for CDI each year in case he forgot something.  In this manner, he came up with the following summary of hours for 1990 and 1991:

| Year | Entity | Hours |
|------|--------|-------|
| 1990 | Partnerships | 1350 |
|      | CDI | 396 |
|      | CCI | 41 |
|      | Encosys | 1 |
|      | Other (includes outside activities) | 200 |
| 1991 | Partnerships | 1205.5 |
|      | CDI | 483.5 |
|      | CCI | 100 |
|      | Other | 166 |

The underlying notes from which petitioner had prepared the diaries were disposed of prior to trial.

Petitioners filed joint Forms 1040, U.S. Individual Income Tax Return, for 1990 and 1991. On Schedules E attached to their returns petitioners reported losses of $692,676 and $638,604, in 1990 and 1991, respectively, as petitioner's share of passive losses from the partnerships. Furthermore, for purposes of section 469, petitioners classified their participation in the business activity of CDI in 1990 and 1991 as passive. On that basis, petitioners reported as passive income their share of taxable income from CDI in the amounts of $714,212 in 1990 and $596,642 in 1991 on the Schedules E.

On November 7, 1995, respondent issued a notice of deficiency to petitioners for their 1990 and 1991 taxable years. Among other adjustments, respondent disallowed petitioners'

treatment of the income from CDI as passive, and, as a result, disallowed the use of the passive losses from the partnerships to offset petitioners' income from CDI.

In preparing for trial, petitioner recalculated the hours of time he had spent on CDI activities. Petitioner used a somewhat different process for trial than he did in 1990 and 1991 because his "motivation is much different * * * I have to in part defend myself * * * [and] have to be very accurate which I wasn't advised of in 1990 and 1991". In his recalculation, petitioner compiled a list of projects and activities that he was involved with for CDI and broke each of them down into various parts. Then, he examined all of the related documents in his possession pertaining to such activities and assigned a time to each of the activities based on his judgment and experience. Occasionally, the time allocated to an activity was also set forth in the calendar and could be cross-referenced for accuracy. Petitioner did not use a cushion in making this calculation, and in this manner he determined that he had spent 318.75 hours in 1990 and 439.8 hours in 1991 on CDI activities.

Among the numerous estimates made in his recalculation, petitioner determined that he held informal office meetings for 4 hours and secretarial meetings for 2.5 hours. Some of the time

petitioner spent on the secretarial and informal office meetings was allocated to businesses other than CDI, since the secretaries and other employees also performed services for those other enterprises. Petitioner also allocated an average of 3 minutes to each item of correspondence he read for CDI. He allocated 5 seconds for each check that he had signed for CDI.

Petitioner also testified that he examined telephone billing records to determine the time he had spent on CDI-related calls. While he stated that he was able to differentiate which calls were made on behalf of the partnerships and which calls were made for CDI, on cross-examination petitioner could not say on whose behalf some of the calls were made, nor did he recognize many of the phone numbers. Although petitioner claimed to have called some of the numbers to find out who they belonged to when preparing for trial, he neglected to keep any notes or record of his efforts. (The record does not reflect whether petitioner calculated time spent on incoming calls he fielded on behalf of CDI.) Petitioner was also unable to explain how he arrived at his estimate of 5 hours spent on miscellaneous administrative office matters.

In making his calculations, petitioner did not include any time devoted by Mrs. Carlstedt to activities for CDI other than

signing checks, such as engaging in travel and entertainment, and performing any other miscellaneous work for CDI such as distributing tickets to CDI employees. Moreover, he did not include time that he spent proposing and negotiating build-to-suit leases for the partnerships from which CDI was certain to earn income constructing tenant finishes. Nor did petitioner allocate to CDI any time that he spent on bid presentations for projects CDI did not obtain, as many records relating to such presentations were no longer available. In at least one instance, petitioner did not allocate to CDI any time spent in determining whether an invoice belonged to CDI or the partnerships, even though ultimately he determined the expense was CDI's. He claimed that this was because he was acting in his role as managing general partner to determine it was not a partnership expense.

Petitioner testified that he never had any confusion as to whether he was acting on behalf of CDI or the partnerships during 1990 or 1991. Petitioner admitted, however, that "we may not have been as careful on formality as we should have". Moreover, his contractors and clients on occasion confused CDI with the partnerships in their correspondence. Although certain letters were addressed to CDI, petitioner determined that they involved a

partnership issue and allocated his time spent dealing with such matters accordingly.  Moreover, in the minutes of certain meetings, petitioner was listed as representing Citimark, while at other meetings on the same matter, petitioner was listed as representing CDI.

OPINION

We must decide whether petitioner materially participated in the activity of CDI during the years at issue for purposes of section 469 and the temporary regulations thereunder.  If so, then petitioners cannot offset their share of passive losses from the partnerships against income from CDI.  If petitioner is found not to have materially participated in CDI, we must then consider whether 1.469-2T(f)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5721 (Feb. 25, 1988), which under certain circumstances recharacterizes as active income that which would otherwise be considered passive, is invalid on its face or as applied to petitioners.

We note at the outset that the determinations of respondent in a notice of deficiency are presumed correct, and taxpayers bear the burden of proving that respondent's determinations are incorrect.  Rule 142(a).

I.  Whether Petitioner Materially Participated in CDI in 1990 and 1991

Respondent argues that the income realized by petitioners from CDI was not passive within the meaning of section 469, and, accordingly, petitioners may not deduct their undisputed passive losses from the partnerships against it for the years at issue. (We note that section 469(c)(7), which provides special rules for taxpayers in the real property business concerning the nature of rental real estate activity, was not in effect for the years at issue.)  Petitioners, on the other hand, contend that they may deduct their passive losses from the Citimark partnerships against what is, according to their position, passive income of CDI.

Section 469(a)(1) provides generally that any passive activity loss claimed by a taxpayer during any taxable year is not allowable as a deduction.  Section 469(a)(2) includes as affected taxpayers, among others, any individual.  Section 469(d)(1) provides that the term "passive activity loss" means the amount, if any, by which the aggregate losses from all passive activities for the taxable year exceed the aggregate income from all passive activities for such year.

Section 469(c) defines a passive activity as follows:

(1)  In general.--The term "passive activity" means any activity--

(A) which involves the conduct of any trade or business, and

(B) in which the taxpayer does not materially participate.

The parties do not dispute that CDI during the years at issue was involved in the conduct of a trade or business for purposes of section 469(c).  Rather, petitioners maintain that petitioner did not materially participate in the activity of CDI and therefore his share of CDI's income from that activity falls within the definition set forth in section 469(c)(1).  Respondent avers that petitioners have not sustained their burden of proof.  We agree with respondent.

For the reasons which follow, we hold that petitioners have failed to establish that petitioner did not materially participate in the activity of CDI during the years at issue.

Section 469(h) provides:

(h) Material Participation Defined.--For purposes of this section--

(1) In general.--A taxpayer shall be treated as materially participating in an activity only if the taxpayer is involved in the operations of the activity on a basis which is--

     (A) regular,

     (B) continuous, and

     (C) substantial.

In determining whether a taxpayer materially participated in an activity, the participation of the spouse of a taxpayer in the activity is also taken into account.  Sec. 469(h)(5); sec. 1.469-5T(f)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

     In implementing section 469, Congress specifically authorized the Secretary to prescribe regulations as to "what constitutes * * * material participation".  Sec. 469(l)(1). Pursuant to that authorization, section 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), lists 7 alternative situations where an individual shall be treated, for purposes of section 469, as materially participating in an activity.  Here, respondent relies on alternative (1) of that temporary regulation, which provides that a taxpayer will be considered to have materially participated in an activity if "The individual participates in the activity for more than 500 hours during * * * [the] year".  Sec. 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).  (At trial

respondent also raised the issue of whether petitioner materially participated in the activity of CDI for 1990 and 1991 under the "facts and circumstances" test of section 1.469-5T(a)(7), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). On brief, however, respondent did not address this argument and is taken to have abandoned this position. See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).)

Section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides that taxpayers can establish the extent of their participation in an activity "by any reasonable means."  Reasonable means "may include, but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries."  Sec. 1.469-5T(f)(4), Temporary Income Tax Regs.  In that respect, "Contemporaneous daily time reports, logs, or similar documents are not required if the extent of * * * participation may be established by other reasonable means."  Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra (emphasis added).

We think that, in general, petitioner has attempted to give credible testimony as to the services he performed for CDI during the relevant period. Under the circumstances, however, we believe that the methods petitioner used to approximate the time he spent performing such services during 1990 and 1991 are not reasonable within the meaning of section 1.469-5T(f)(4), Temporary Income Tax Regs.

This Court has previously noted that, while the regulations are somewhat ambivalent concerning the records to be maintained by taxpayers, they by no means allow a postevent "ballpark guesstimate". Speer v. Commissioner, T.C. Memo. 1996-323 (quoting Goshorn v. Commissioner, T.C. Memo. 1993-578). In the instant case, while perhaps not falling within the postevent "ballpark guesstimate" category, Goshorn v. Commissioner, supra, we nevertheless conclude that petitioner's estimates were, on the whole, unreliable and inconsistent. Petitioner's rationale for allegedly spending less than 500 hours per year on CDI activities, as well as the testimony of petitioners' witnesses, fails to convince us otherwise.

In response to petitioners' concerns, we do not question the fact that petitioner's various enterprises were separate legal

entities.  However, the manner in which the businesses were actually conducted reveals a cohesiveness that was not accurately accounted for in petitioner's estimations.  The functions of the businesses, while distinct, were closely integrated and synergistic.  For example, benefits from leases obtained by the partnerships flowed predictably to the other businesses, especially to CDI.  The partners and shareholders frequently overlapped.  Moreover, the businesses all shared the same office and phone lines, and CDI generally functioned as a conduit for the payment of the expenses of all of the businesses.  Despite the time he purportedly spent on the partnerships, none of the cost of the office space was allocated to them, notwithstanding petitioner's claims that the entities were separate.

Despite the foregoing, petitioner failed to allot time to CDI for activities that were certain to redound to its benefit, such as the build-to-suit lease proposals negotiated by petitioner.  (We agree with petitioners that petitioner's fiduciary duties owed by petitioner to the partnerships and CDI may have differed due to different owners and partners such that he could not have engaged in self-dealing between those entities

in the strict sense of the term.  However, petitioner's activities on behalf of the partnerships never conflicted with the interests of CDI, and only helped CDI.)  Petitioner was inconsistent in that respect since, for example, his time spent on meetings with the secretaries and other employees of CDI was allocated to the other companies as well as to CDI.

Moreover, we think that the time petitioner acknowledged spending on purely CDI activities was understated.  Although contemporaneous, his calendar only accounts for about one-third of the hours listed in his diaries and is sketchy, with numerous gaps.  The calendar frequently lists appointments with individuals without indicating on behalf of which entity the appointment had been made.

Furthermore, petitioner's diary of activities is hardly the narrative summary contemplated by the temporary regulations.  Rather, it is a numerical compilation of hours petitioner allocated to his activities for CDI based on his review of the calendar and uncorroborated estimates.  The notes from which the diaries were made were disposed of prior to trial.  Moreover, in contrast to petitioner's testimony, neither the diaries themselves, nor a supplemental protest which petitioners filed

with the IRS Appeals Division which discusses the diaries in depth, mentions any additional "cushion" of hours for CDI activities. The diaries also did not fully account for his work time since they were based on a 40-hour week, yet he claimed generally to have worked over 40 hours per week. No explanation was given as to whether any of the time not accounted for could be allocated to CDI activities.

Petitioner's document-based method is also unreliable, as the documents themselves do not provide any objective measure of time for activities extrapolated therefrom. Rather, petitioner assigned times to activities years later based solely on his judgment and experience as to how long the activities must have taken him. Even if such uncorroborated estimates were made in good faith, memories can fade with time, and records can be lost or thrown out, as occurred here.

In addition, some of the times petitioner assigned to his activities appear on their face inadequate to the Court. Petitioner allocated only 5 seconds for each check that he signed for CDI, yet he was able to discern and question a relatively minor $88.25 expense. Petitioner allocated an average of 3 minutes per item of correspondence and claimed not even to have

read many of the carbon copies frequently sent to him by his employees, even though he was CDI's president.  Even more problematic is the fact that some times were not assigned at all to activities he engaged in CDI, such as bid presentations on projects CDI did not get, since documents for such presentations were not always available.

Petitioner claims that he did not spend much time on CDI activity because his partnerships, together with various civic and familial responsibilities, preoccupied him during the years at issue.  While petitioner's participation in activities other than CDI may have had a bearing on the level of his activity for CDI, that does not necessarily mean his participation in CDI dipped below 500 hours.  In this regard, we note petitioner's testimony that "especially in 1991" the time he spent on the partnerships had increased, yet by his own estimate, his time at CDI had increased substantially that year as well.  Thus, time spent on the two activities by petitioner was not inversely proportional.

In addition, petitioner's partnership activities do not seem as onerous as he claimed.  Roger Eiteljorg was available to assist petitioner in his efforts to secure long-term financing

for the partnerships.  Roger Eiteljorg stated that they met with only 1 or 2 potential lenders each week over the 2-year period. In addition, the development of information packages for prospective lenders did not have to be done repeatedly; much information compiled by petitioners appears to be of the type that could have been used over again before being tailored to the requirements of specific lenders.  Furthermore, although petitioner and Roger Eiteljorg said that prospecting for tenants was one of petitioner's primary responsibilities as managing general partner of the partnerships, that was also one of CMI's responsibilities.  No explanation was made as to why the employees of CMI were not charged with this task, or why the time spent on that activity by petitioner was allocated to the partnerships and not to CMI.

We also do not find the testimony of petitioners' witnesses as to his participation in CDI persuasive, and there is little objective evidence in the record to support petitioner's self-serving estimations.  None of petitioners' witnesses could attest to the number of hours that petitioner spent working for CDI, and they only gave vague statements as to the extent of his participation.  Petitioner himself stated that it was "difficult

* * * to tell who worked for who" at the office.  Dickman stated
that petitioner's hours at CDI "couldn't be very many".  Mike
Price's testimony that petitioner spent "all his time with the
partnerships" is obviously not true since, by petitioner's own
admission, he spent several hundred hours a year on CDI business.
Kenneth Johnson merely stated that petitioner spent "the majority
of his time with the partnerships".  However, he did not observe
petitioner's activities on a daily basis, and did not know the
level of petitioner's participation in CDI at the office or on
John Cook's projects.  Cf. Harrison v. Commissioner, T.C. Memo.
1996-509 ("Although this Court has not always accepted a post-
event narrative of participation, * * * we find petitioner's
description of his participation, when combined with * * *
[witness] testimony and the objective evidence in the record, to
be credible".)

Finally, petitioner allocated no time to Mrs. Carlstedt's
activities for CDI, other than check signing.  Mrs. Carlstedt was
partially responsible for ticket distribution to CDI employees.
Moreover, she attended events which, viewed objectively, could be
construed as having business development purpose.  (Petitioners'
supplemental protest acknowledged as much.)  Mrs. Carlstedt was,

after all, a director and officer of CDI.  Nevertheless, Mrs. Carlstedt did not testify as to her involvement with CDI, despite petitioners' knowledge that that was one of the areas that the Commissioner was exploring in determining whether petitioner materially participated in CDI activities.  It is well established that the failure of a party to introduce evidence within his possession which, if true, would be favorable, gives rise to the presumption that, if produced, it would be unfavorable.  Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

We are left with petitioner's self-serving testimony that he did not materially participate in the activities of CDI in 1990 and 1991.  The Court is not bound to accept the unverified, undocumented testimony of taxpayers, and we decline to do so in the instant case.  See Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

In light of the above, we hold that petitioners have failed to meet their burden of proving that petitioner was not involved in the operation of CDI on a basis that was regular, continuous, and substantial in 1990 and 1991 within the meaning of section 469(h)(1) and section 1.469-5T(a), Temporary Income Tax Regs., 53

Fed. Reg. 5725 (Feb. 25, 1988); consequently, petitioners may not offset passive losses from the partnerships against CDI income in those years.  See Rule 142(a); <u>Mordkin v. Commissioner</u>, T.C. Memo. 1996-187.

## II.  Whether Section 1.469-2T(f)(2), Temporary Income Tax Regs., Is Invalid

Since we hold that petitioners have failed to establish that petitioner did not materially participate in the activity of CDI during the years at issue, we need not address the validity of section 1.469-2T(f)(2), Temporary Income Tax Regs., 53 Fed. Reg. 5726-5727 (Feb. 25, 1988), either in general or as applied to petitioners in this case.  (The brief amicus filed on behalf of the National Realty Committee addresses only this point.)

To reflect the foregoing and issues previously conceded,

<u>Decision will be entered for respondent</u>.