# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————

No. 17-60315

————————

MARY L. HATCHER; BRADLEY J. HATCHER,

Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent–Appellee.

United States Court of Appeals
Fifth Circuit

**FILED**

April 9, 2018

Lyle W. Cayce
Clerk

_____

cons w/ 17-60318

MARY L. HATCHER, also known as Mary L. Bell,

Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent–Appellee.

————————

Appeals from the Decision of the
United States Tax Court
TC No. 23243-13

————————

No. 17-60315 c/w No. 17-60318

Before STEWART, Chief Judge, and HAYNES and WILLETT, Circuit Judges.

PER CURIAM:*

The married Appellants Mary and Bradley Hatcher filed a petition against the Commissioner of Internal Revenue asserting primarily that the Commissioner miscalculated their tax burden and, as a result, imposed upon them illegitimate accuracy-related penalties. The tax court sided with the Commissioner. On appeal, the Hatchers contend the tax court clearly erred in finding they were ineligible for two deductions: one related to a business debt and the other related to a rental property. They also contest the corresponding accuracy-related penalties. We hold that the tax court did not clearly err in any of its factual determinations, and we AFFIRM the judgment of the United States Tax Court.

## I. BACKGROUND

### A.     The Hatchers

Mary Hatcher (formerly Mary Bell) received an undergraduate degree in business and a graduate degree in corporate finance. From 2000 to 2009, she worked full-time as a corporate executive at the Blockbuster Corporation. She held various positions at Blockbuster, including corporate treasurer and, later, head of finance and accounting. Her duties included overseeing Blockbuster's cash management, lender relationships, debt deals, loan agreements, and taxes. In 2010, Mary transitioned from working full-time at Blockbuster to working as a consultant. After the transition, she continued to work with Blockbuster as an independent contractor. Mary also advised a broadcasting and technology firm about content development.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

In July 2010, Mary married Bradley Hatcher, who worked as a real estate professional. He began this career in the mid-1990s, specializing in commercial loan origination. In 2010, Bradley decided to prepare a property located at 6163 Anita Street in Dallas, Texas, for rental. Bradley testified that for the first half of 2010 he spent between 10 and 15 hours per week preparing the property, which he rented beginning in June 2010. He continued to perform maintenance on the property for the remainder of the year, devoting roughly 10 hours per month to this work. Separately, Bradley spent an indeterminate amount of time "preparing and prepping for" loans that he anticipated refinancing for potential clients.

## B.    The Carpenter Debt

Before marrying Bradley, Mary was romantically involved with Brad Carpenter from 2004 to 2005. During this time, Mary formally lent money to Carpenter. Her loans to Carpenter were intended to cover his "personal expenses and the development of a golf-themed comic strip, 'In the Rough.'"[1] Mary disclosed these loans to her employer, Blockbuster.

Before lending money to Carpenter, Mary did not investigate his financial background or his ability to repay the loan. The loans were not secured by any collateral. Mary did not profit from her lending; she did not receive an ownership interest in the comic strip, nor did she charge any fees associated with her lending. Her loans to Carpenter were the only formal loans that she made between 2004 and 2010.

In total, Mary loaned Carpenter $430,500. She first transferred funds to him in March 2004. A promissory installment note establishing a principal amount of $75,000 and outlining the repayment terms accompanied the

---

[1] Carpenter used the funds from one transaction—totaling $50,000—to cover the purchase of a Hummer vehicle; Mary knew that Carpenter planned to purchase a vehicle with the funds.

3

transfer. Even after their romantic relationship ended in 2005, Mary continued to loan Carpenter money. In June 2006, Carpenter signed a promissory note establishing a principal loan amount of $430,500 (plus interest) to be repaid by December 31, 2007. Mary and Carpenter amended the note in February 2008 and again in April 2010. The April 2010 note obligated Carpenter to repay the loan by December 31, 2010; he owed $582,553.16 at the time—the principal plus interest.

Mary and Carpenter exchanged e-mails in December 2010 regarding Carpenter's failure to repay the loans. During this exchange, Carpenter expressed hope that he could repay Mary. He wrote on December 16: "As It [sic] stands currently, I have a very good chance to take care of you." The next day, however, he wrote, "I HAVE NO MONEY." By the end of 2010, Carpenter had repaid a mere $7,000.

## C.     MBH Partners, LLC

In October 2010, Mary registered MBH Partners, LLC with the State of Texas. Mary was the sole member of MBH until April 2011, when she added her husband Bradley as a member. Mary intended MBH to be an umbrella organization under which she could "consolidate [her] business interest[s]," including her advisory and consulting services.

Upon its formation, MBH's sole asset was the Carpenter promissory note—now valued at $600,847.09. Mary contributed no other cash or assets to MBH, which had no clients nor reported any income in 2010. MBH also did not engage in any lending or debt collection activities that year.

In February 2011, MBH sent Carpenter a final notice of default and acceleration of debt. Later that month, MBH sued Carpenter for his failure to repay the debt. In February 2012, MBH won a judgment against Carpenter for $573,174.63 (plus post-judgment interest) and $50,000 in attorney fees. MBH then sought to enforce the judgment. In a post-judgment motion to compel

discovery, MBH alleged that Carpenter had deposited nearly $18,000 into a bank account—but he failed to explain his income sources. These collection efforts continued until at least April 2012.

## D.     Tax Filings

Mary prepared the Hatchers' 2010 joint federal income tax return. Mary testified that she relied on IRS guidance when filing the return. The Hatchers reported a negative adjusted gross income of $257,816.40. They also attached a Schedule C (Form 1040: Profit or Loss From Business) for MBH. The return claimed a $600,847.09 bad debt expense for a "Note Receivable from BCarpenter." The Hatchers also reported a passive activity loss of $21,624.58 from real estate for the 2010 tax year. The Hatchers did not classify Bradley as a real estate professional when reporting this loss.

The Hatchers suffered a net operating loss[2] for 2010. Consequently, Mary filed a Form 1045 Application for Tentative Refund with regard to her 2008 taxes. Mary sought to carry back the 2010 net operating loss of $342,086.04 as a deduction for tax year 2008. Carrying that net operating loss back to 2008, Mary calculated that her 2008 tax burden should be decreased by $105,353.17. The IRS subsequently issued Mary a refund for that amount.

## E.     Deficiency Notices

In July 2013, the IRS issued the Hatchers a notice of deficiency for the 2010 tax year. The IRS found the Hatchers responsible for a $100,924.00 deficiency and a $20,184.80 accuracy-related penalty under Internal Revenue

---

[2] A taxpayer incurs a "net operating loss" when the allowable tax deductions exceed the taxpayer's taxable income in a given tax year. If a taxpayer suffers a net operating loss, he or she may be permitted to deduct that loss from his or her taxable income in another given year. If a taxpayer chooses to deduct the net operating loss from a past year's taxable income, that is called a "carryback." *See generally* INTERNAL REVENUE SERVICE, *Publication 536 (2016), Net Operating Losses (NOLs) for Individuals, Estates, and Trusts* (Sept. 11, 2017), https://www.irs.gov/publications/p536 (last visited Feb. 15, 2018).

No. 17-60315 c/w No. 17-60318

Code ("I.R.C.")[3] § 6662 (2017). The alleged deficiency resulted primarily from the IRS's decision not to permit the Hatchers to claim either the bad debt deduction or the passive real estate loss deduction.

That same month, the IRS issued a notice of deficiency to Mary regarding the 2008 tax year. The IRS found Mary responsible for a $106,733.00 deficiency and a $21,346.60 accuracy-related penalty under I.R.C. § 6662. The IRS did not permit Mary to carry back the 2010 net operating loss deduction.

## F.    Tax Court Proceedings

In September 2013, Mary mailed a petition to the tax court, requesting a reconsideration of the IRS's determination that she could not carry back her net operating loss from 2010 as a way to reduce her 2008 tax burden. In October 2013, the Hatchers mailed a petition to the tax court requesting a redetermination of their alleged deficiency for tax year 2010. The Hatchers timely mailed both petitions. *See* I.R.C. §§ 6213(a), 7502.

The tax court exercised jurisdiction over the petitions pursuant to I.R.C. §§ 6213(a), 6214, and 7442. The court consolidated the two cases. Before trial, the parties entered a stipulation of facts with exhibits, which they later supplemented. The tax court conducted a trial in October 2015. The Hatchers represented themselves, and they were the only witnesses. The four primary issues at trial were: (1) whether the Hatchers were entitled to a bad debt deduction in 2010 based on the Carpenter debt; (2) whether Mary could claim a corresponding carryback loss deduction for tax year 2008 due to the Carpenter debt; (3) whether the Hatchers could deduct passive real estate losses regarding Bradley's management of the Anita property in Dallas; and (4) whether accuracy-related penalties could be imposed under I.R.C. § 6662.

---

[3] The I.R.C. is published in Title 26 of the United States Code. All references to the I.R.C. or "Code" in this opinion refer to the Internal Revenue Code of 1986.

6

At the close of the trial, the tax court ordered post-trial briefing.[4] The parties complied.

In October 2016, the tax court issued its Memorandum Findings of Fact and Opinion. The court then ordered the parties to "file computations for entry of decision under tax court Rule 155, or file a joint status report on or before December 13, 2016." After the tax court granted an extension, the parties filed their computations on January 13, 2017.

On January 24, 2017, the tax court decided that there was "a deficiency in income tax due from the [Hatchers] for the taxable year 2010 in the amount of $100,625.00; and [t]hat there [was] a penalty due from the [Hatchers] under the provisions of I.R.C. § 6662 for the taxable year 2010 in the amount of $17,953.60." Regarding Mary's 2008 tax obligations, the tax court decided "[t]hat there [was] a deficiency in income tax due from [Mary] for the taxable year 2008 in the amount of $105,353.00; and [t]hat there [was] a penalty due from [Mary] under the provisions of I.R.C. § 6662 for the taxable year 2008 in the amount of $21,070.60."

## II. DISCUSSION

The Hatchers timely filed notices of appeal in each proceeding. *See* I.R.C. § 7483; FED. R. APP. P. 13(a). Upon the Hatchers' unopposed motion, this Court consolidated the appeals. We have jurisdiction over the appeals pursuant to I.R.C. § 7482(a)(1).

We review the tax court's factual findings for clear error and review its legal conclusions de novo. *Arevalo v. Comm'r*, 469 F.3d 436, 438 (5th Cir. 2006). "Clear error exists when this court is left with the definite and firm conviction that a mistake has been made." *Green v. Comm'r*, 507 F.3d 857, 866 (5th Cir.

---

[4] Typically, a tax court proceeding involves establishing the evidentiary record during a trial before a judge, followed by post-trial briefing by the parties. Here, the tax court ordered one round of simultaneously filed post-trial briefs.

2007) (citation omitted). If "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Brinkley v. Comm'r*, 808 F.3d 657, 664 (5th Cir. 2015) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)).

This opinion cites numerous tax court opinions.[5] Although non-binding, the Supreme Court has recognized the persuasive value of these opinions. *Dobson v. Comm'r*, 320 U.S. 489, 502 (1943) ("The Tax Court is informed by experience and kept current with tax evolution and needs by the volume and variety of its work. While its decisions may not be binding precedents for courts dealing with similar problems, uniform administration would be promoted by conforming to them where possible.").

## A.   The Tax Court Did Not Clearly Err in Finding that the Hatchers Could Not Claim a Business Debt Deduction under I.R.C. § 166(a) for Tax Year 2010.

The central argument on appeal is whether the Code permits the Hatchers to deduct the Carpenter debt as a bad business debt. Generally, a taxpayer may deduct from income "any debt which becomes worthless within the taxable year." I.R.C. § 166(a)(1). The Code distinguishes between business and nonbusiness debt. Among other consequences, a debt's classification affects whether a taxpayer may deduct the debt as a carryback loss.

---

[5] The United States Tax Court classifies its opinions in a number of ways. *See generally* UNITED STATES TAX COURT, *Taxpayer Information: After Trial* (Dec. 12, 2017), https://www.ustaxcourt.gov/taxpayer_info_after.htm (last visited Feb. 15, 2018). There are "Bench Opinions," "Summary Opinions," "Tax Court Opinions," and "Memorandum Opinions." Bench Opinions and Summary Opinions may not be relied upon as precedent before the tax court. *Id.* Tax Court Opinions and Memorandum Opinions, however, may be relied upon as precedent. *Id.* Generally, Memorandum Opinions are issued in "regular case[s] that [do] not involve a novel legal issue," and Tax Court Opinions are issued in "regular case[s] when the Tax Court believes [the case] involves a sufficiently important legal issue or principle." *Id.* This opinion cites only "Tax Court Opinions" and "Memorandum Opinions."

The Hatchers assert that the Carpenter debt became worthless in 2010 and the debt is a bad business debt. Thus, they should be allowed to deduct the debt from their 2010 tax burden. This deduction creates a net operating loss, which Mary can deduct as a carryback loss on her 2008 tax return.

The tax court disagreed. The court found that the Carpenter debt was a nonbusiness debt that did not become worthless in 2010. Thus, the Hatchers could not invoke this deduction for tax year 2010, nor could they claim a net operating loss. And because there was no 2010 net operating loss, Mary could not deduct the debt as a carryback loss on her 2008 tax return.

We conclude that the tax court did not clearly err in finding that the Carpenter debt did not become worthless in 2010. This conclusion means that the Hatchers may not deduct the debt for tax year 2010. Therefore, we do not need to address whether the tax court erred in classifying the debt as either a business or nonbusiness debt because any classification error would be harmless. *See Brinkley*, 808 F.3d at 664.

### 1. The Carpenter Debt Did Not Become Worthless in 2010.

"To deduct a bad debt, the debt must have become 'worthless within the taxable year.'" *Estate of Mann*, 731 F.2d 267, 275 (5th Cir. 1984) (quoting I.R.C. § 166(a)(1)). This is a factual determination, *id.* (citations omitted), so the tax court's decision is reviewed for clear error. *Cox v. Comm'r*, 68 F.3d 128, 131 (5th Cir. 1995).

The burden is on the taxpayer to "prove that on January 1 of the taxable year the debt[] had some intrinsic or potential value, and that by December 31 the debt[] had lost all such value." *Estate of Mann*, 731 F.2d at 275. The taxpayer must prove that "there are reasonable grounds for abandoning any hope of repayment in the future." *Id.* To meet this burden, "[t]he taxpayer must demonstrate an identifiable event that rendered the debt worthless." *Cox*, 68 F.3d at 131–32 (footnote omitted). "If and when such a debt becomes wholly

worthless must be determined from the facts and circumstances known or which reasonably could have been known at the end of the year of asserted worthlessness," *Estate of Mann*, 731 F.2d at 278, but "proof of subsequent events may be allowed . . . insofar as they may be relevant to the reasonableness of a conclusion that a debt became worthless in the particular year in issue," *id.* at 278 n.19. Even a debtor's bankruptcy "is not enough by itself to establish worthlessness." *Cox*, 68 F.3d at 132 (footnote omitted).

The tax court—assuming *arguendo* the Carpenter debt was a business debt—concluded that the Hatchers "did not carry their burden of proving that the note was wholly worthless as of December 31, 2010." *Hatcher v. Comm'r*, 112 T.C.M. (CCH) 415, 2016 WL 5849079, at *6 (2016). The Hatchers relied primarily upon Carpenter's December 2010 e-mail to Mary in which he proclaimed that he had "no money." Yet, to the tax court, this did not demonstrate that the Hatchers had reasonable grounds for abandoning any hope of repayment. *See id.* at *7. The court focused on the Hatchers' subsequent decision to sue Carpenter in an attempt to enforce repayment of the note. *See id.* The Hatchers "served post-judgment discovery on Mr. Carpenter in an effort to collect on this judgment, alleging that he had substantial monthly income and unexplained bank deposits," and they negotiated with Carpenter in late 2012 "in an effort to recover at least some portion of the debt." *Id.* The tax court concluded that in light of the Hatchers' "extensive business and finance backgrounds, it [was] implausible that they would have kept throwing good money after bad if they genuinely believed the Carpenter note had become wholly worthless two years previously." *Id.*

On appeal, the Hatchers devote one paragraph to explaining why the Carpenter debt became worthless in 2010. Mary requested payment from Carpenter multiple times, exchanged numerous e-mails with him regarding this subject, and eventually received an e-mail from Carpenter proclaiming his

lack of money. According to the Hatchers, these facts prove that the tax court erred by finding that the Carpenter debt did not become worthless in 2010.

We conclude that the tax court did not clearly err. The Hatchers identify only one event to substantiate their claim that they reasonably believed the debt became worthless in 2010: Carpenter's e-mail proclamation that he had "no money." But there is no evidence that the Hatchers verified—or attempted to verify—Carpenter's financial situation. Nor did Carpenter make his statement under oath. Given that this circuit does not treat even a debtor's bankruptcy as independently establishing the worthlessness of a debt, *see Cox*, 68 F.3d at 132, it follows *a fortiori* that a party's unverified declaration of insolvency is insufficient to do so. Thus, the e-mail alone cannot prove the debt's worthlessness.

Also, the tax court properly looked to the Hatchers' subsequent efforts to collect from Carpenter as evidence that they lacked reasonable grounds to abandon hope of repayment. They sent a final notice of default and acceleration of debt in February 2011; they filed a lawsuit later that month and ultimately received a judgment against Carpenter a year later; and Mary transferred half of the value of the Carpenter note to Bradley. Looking at events that occurred in the year following when the debt allegedly became worthless is an accepted method of assessing the alleged worthlessness of the debt during the tax year in question. *See Estate of Mann*, 731 F.2d at 278 n.19. We agree with the tax court's assessment that the Hatchers, in light of their business backgrounds, likely would not have recklessly pursued litigation against Carpenter unless they held out hope that he could repay the debt. Overall, the tax court relied on adequate evidence to find that the Carpenter debt did not become worthless in 2010, and there are no grounds for us to reverse the court's factual determination. *See Green*, 507 F.3d at 866.

This provides an adequate basis to resolve the first issue on appeal without addressing whether the debt is a business or nonbusiness debt. That is, even if the Carpenter debt is classified as a business debt, the debt still did not become worthless in 2010—and thus the Hatchers are unable to claim a deduction under I.R.C. § 166(a).

### 2. *Mary May Not Carry Back a Net Operating Loss Deduction.*

In light of our determination that the Carpenter debt did not become worthless in 2010, it follows that we affirm the tax court's determination that Mary was not entitled to a corresponding carryback loss for 2008. *See* I.R.C. §§ 166, 172; *Generes*, 405 U.S. at 95–96; *Estate of Mann*, 731 F.2d at 272 n.7.

### B.    The Tax Court Did Not Clearly Err in Finding that Bradley Was Not a Qualified Real Estate Professional for Tax Year 2010.

The next issue is whether the tax court correctly prohibited the Hatchers from deducting a passive activity loss. This depends on whether Bradley was a qualified real estate professional for tax year 2010. This is a factual determination. *See Bailey v. Comm'r*, 82 T.C.M. (CCH) 868, 2001 WL 1360438, at \*4–6 (2001); *see also Hill v. Comm'r*, 436 F. App'x 410, 412 (5th Cir. 2011) (treating the tax court's determination of whether a taxpayer is a real estate professional as a fact question subject to clear-error review).

The I.R.C. includes "rental activity" as a "passive activity." *See* § 469(c)(2). Generally, a "passive activity loss" is not an allowable deduction for individual taxpayers. *Id.* § 469. However, there is an exception to this general rule for individual taxpayers who materially participate in a "real property trade or business," which is defined as "any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business." *Id.* § 469(c)(7). A taxpayer seeking to qualify for the § 469(c)(7) exception must satisfy two requirements:

No. 17-60315 c/w No. 17-60318

(1) [M]ore than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, [and;]

(2) [S]uch taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

*Id.* § 469(c)(7).[6]

Taxpayers may demonstrate their material participation by "any reasonable means," including "the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries." 26 C.F.R. § 1.469-5T(f)(4). A taxpayer is not required to produce "[c]ontemporaneous daily time reports, logs, or similar documents" so long as the taxpayer can demonstrate the extent of his or her participation through "other reasonable means." *Id.*

The tax court has recognized repeatedly that "while the regulations are somewhat ambivalent concerning the records to be maintained, they by no means allow . . . [the taxpayer to rely on a] post-event ballpark guesstimate." *Goshorn v. Comm'r*, 66 T.C.M. (CCH) 1499, 1993 WL 500167, at *3 (1993); *accord Bailey*, 2001 WL 1360438, at *6 (rejecting a taxpayer's uncorroborated, pre-trial estimates of time spent on real estate rental activities); *Carlstedt v. Comm'r*, 74 T.C.M. (CCH) 170, 1997 WL 407788, at *8 (1997) (rejecting estimates that "were, on the whole, unreliable and inconsistent").

The crux of the issue on appeal is whether the tax court erred in finding that Bradley performed fewer than 750 hours of relevant services during tax

---

[6] If spouses file jointly, only one spouse needs to satisfy the § 469(c)(7) exception requirements. *See* I.R.C. § 469(c)(7)(B).

year 2010. The tax court found that that Bradley "performed *at most* 450 hours of services in real property businesses during 2010." *Hatcher*, 2016 WL 5849079, at *8 (emphasis added). The court calculated this sum based on Bradley's testimony about his time spent working on the Anita property in Dallas. *See id.* Although the Hatchers "maintained no documentation of the time they devoted to the Anita property," the court found that "Bradley credibly testified that he devoted 10 to 15 hours per week to the property during the first half of 2010 and 10 hours per month during the second half." *Id.* Also, the tax court did not find that Bradley could reliably quantify any additional hours spent originating real estate loans or preparing loans for refinancing through MBH. *See id.*

On appeal, the Hatchers assert that the tax court clearly erred by failing to include in its calculation the hours that Bradley spent "preparing [real estate] loans for refinancing." The Hatchers highlight Bradley's previous experience working on commercial real estate financing, his advisory activities through MBH, and his testimony before the tax court that he had expected to refinance a number of loans that he had previously originated. The Hatchers assert that "there could have been very significant services through MBH" that the tax court did not account for. And these additional hours could push Bradley above the 750-hour requirement. Thus, the Hatchers request that the panel remand this issue to the tax court with instructions to calculate and add Bradley's hours working through MBH to the hours he spent working on the Anita property.

We conclude that the tax court had an adequate basis for its determination that Bradley spent—at most—450 hours working in the real estate business for tax year 2010. The Hatchers bear the burden of proving that, during tax year 2010, Bradley performed more than 750 hours of services in the real estate business. *See* I.R.C. § 469(c)(7). They may quantify Bradley's

14

service hours through any reasonable means, but they cannot merely offer a "ballpark guesstimate" of how many hours Bradley worked. *See Goshorn*, 1993 WL 500167, at *3. The Hatchers failed to carry this burden. At most, Bradley's testimony supports finding that he performed 450 hours of work on the Anita property. The Hatchers offer no reliable way—beyond an assertion that is contradicted by the record—to prove that Bradley worked more than 750 hours in the real estate business in 2010.

The tax court was correct to exclude Bradley's advisory work from the hours calculation. First, Bradley failed to present any reasonable means of ascertaining how many hours he worked on real estate business through MBH. Second, MBH had no clients in 2010, and Bradley did not become an MBH employee until April 2011. Thus, the record contradicts his claim that he worked in the real estate business through MBH in 2010.

In sum, the tax court did not ignore any credible evidence supporting a higher estimate of the hours Bradley spent working as a real estate professional. This is a factual determination by the tax court, which we review for clear error, and nothing in the record establishes that the tax court clearly erred. *See Green*, 507 F.3d at 866. Thus, we affirm the tax court's determination.

## C.   The Tax Court Did Not Clearly Err in Determining that the Hatchers Could Be Subject To Accuracy-Related Penalties Under I.R.C. § 6662.

Section 6662 outlines how and when accuracy-related penalties may be imposed due to a tax burden understatement. One situation justifying a penalty is when a taxpayer is responsible for a "substantial understatement of

income tax." I.R.C. § 6662(b).[7] A "substantial understatement" is an understatement that exceeds the greater of: "(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000." *Id.* § 6662(d)(1)(A). Penalties for a substantial understatement may also apply to any corresponding carryback loss deductions that result in underpayment. *See* 26 C.F.R. § 1.6662-4 (explaining that a penalty may arise when an underpayment results from a deduction due to a "tainted item . . . for which there is neither substantial authority nor adequate disclosure"). The resulting financial penalty added to the tax burden is "an amount equal to 20 percent of the portion of the underpayment" at issue. I.R.C. § 6662.

Section 6664, however, provides a safe haven: "No penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a *reasonable cause* for such portion and that the taxpayer acted in *good faith* with respect to such portion." I.R.C. § 6664(c)(1) (emphasis added); *see Green*, 507 F.3d at 871. The taxpayer bears the burden of proof when invoking this defense. *Klamath Strategic Inv. Fund v. United States*, 568 F.3d 537, 548 (5th Cir. 2009).

A court must decide whether "in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer," the taxpayer's mistake resulted from a reasonable, honest misunderstanding of fact or law. 26 C.F.R. § 1.6664-4(b)(1); *see Brinkley*, 808 F.3d at 669. "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." 26 C.F.R. § 1.6664-4(b)(1). "The most important factor is the extent of the taxpayer's effort to assess his proper

---

[7] The Commissioner bears the burden of production when seeking to impose a penalty for a substantial understatement. *Id.* § 7491(c); *see McLauchlan v. Comm'r*, 558 F. App'x 374, 380 (5th Cir. 2014).

liability in light of all the circumstances." *Brinkley*, 808 F.3d at 669 (quoting *Klamath Strategic Inv. Fund*, 568 F.3d at 548). The tax court's determination of whether the defense applies is a question of fact that we review for clear error. *See Green*, 507 F.3d at 871.

The tax court concluded that the Hatchers cannot rely on the good-faith safe haven because they did not act with reasonable cause and in good faith in claiming the business debt deduction and corresponding loss carryback. *Hatcher*, 2016 WL 5849079, at *10. The tax court first addressed Mary's background: she is "a sophisticated financial professional with an M.B.A. in corporate finance." *Id.* at *9. Mary "testified that she relied principally on IRS Publication 535, Business Expenses, to determine that the Carpenter note was a business bad debt that had become worthless during 2010." *Id.* But Mary's testimony did not persuade the tax court; the court believed that Mary's actions belied any good-faith reliance on Publication 535. Mary did not follow the publication's explicit directions regarding when a bad business debt deduction may include accrued interest. *See id.* She also ignored the publication's explanation of when a debt becomes worthless and failed to explain why the Carpenter debt was a business debt. *See id.* Mary offered "no plausible business reason" for contributing the Carpenter note to MBH as its only asset; the tax court inferred that Mary's "actual reason for making this contribution was to put the Carpenter note into a 'business' to enhance the appearance that it was business related." *Id.* The court concluded that the Hatchers' "overall conduct does not show that they made a good-faith effort to determine their correct tax liability with respect to the Carpenter note." *Id.*

No. 17-60315 c/w No. 17-60318

On appeal, the Hatchers again rely on their good faith defense.[8] The Hatchers defend their accounting in two ways. First, they invoke Mary's experience at Blockbuster. During her time there, she "interfaced with the IRS regularly, dealt with IRS statutes and guidelines on a daily basis, and maintained a good relationship with the IRS on behalf of Blockbuster." Second, the Hatchers argue that Mary reasonably relied on guidance from the IRS— specifically, Publication 535—and her prior knowledge to conclude that "it was appropriate to take the business deduction on the Carpenter loan for tax year 2010." Thus, the Hatchers believe that the tax court clearly erred in permitting the Commissioner to impose an accuracy-related penalty on the Hatchers for 2010 and Mary, specifically, for the 2008 carryback.

We find that the tax court did not clearly err in determining that the good faith defense should not apply. The tax court may consider the taxpayer's experience, knowledge, and education. *See Brinkley*, 808 F.3d at 669. Here, the tax court considered Mary's background when assessing whether the Hatchers acted in good faith. Although the Hatchers testified that they reasonably relied on Publication 535, their failure to follow that publication's requirements undermines any claims of good-faith reliance. The Hatchers failed to explain how the Carpenter debt was a bona fide business debt, ignored the publication's instructions regarding accrued interest, and neglected the publication's explanation of how and when a debt becomes worthless (and thus qualifies for a deduction). Considering these circumstances, the tax court did not clearly err by concluding that the Hatchers did not make a good-faith effort to determine their correct tax liability. *See Green*, 507 F.3d at 866. Thus, we affirm the tax court's decision to permit the imposition of accuracy-related

---

[8] The Hatchers seemingly accept that if the claimed bad debt deduction is not allowed, they are responsible for a substantial understatement of their 2010 tax burden and the underpayment for tax year 2008 due to Mary's corresponding loss carryback.

penalties regarding the business debt deduction for tax year 2010 and the 2008 tax year carryback loss deduction.

## D.    The Tax Court Correctly Allocated the Burden of Proof at Trial.

The Hatchers also offer a cursory argument that the tax court erred by not shifting the burden of proof at trial to the Commissioner. The tax court's burden of proof allocation is a legal issue subject to de novo review. *See Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 332 (5th Cir. 2010) (citations omitted). "As a general rule, the Commissioner's determination of a tax deficiency is presumed correct, and the taxpayer has the burden of proving the determination to be erroneous." *Brinkley*, 808 F.3d at 663 (citing Tax Ct. R. 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933)). However, the burden of proof shifts if a taxpayer introduces credible evidence regarding facts relevant to determining her tax liability; complies with relevant substantiation requirements; maintains the required records, and cooperates with reasonable requests by the IRS for meetings, documents, and interviews. *See* I.R.C. § 7491(a).

Our caselaw dictates that "the operation of this burden-shifting scheme is irrelevant when both parties have met their burdens of production and the preponderance of the evidence supports one party." *Brinkley*, 808 F.3d at 664 (citations omitted); *see Whitehouse Hotel*, 615 F.3d at 332 ("The tax court need not decide whether the burden shifted where, as here, both parties offered some admissible evidence."). If both parties satisfy their respective production burdens by offering credible evidence, "the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof or preponderance." *Whitehouse Hotel*, 615 F.3d at 332 (quoting *Blodgett v. Comm'r*, 394 F.3d 1030, 1039 (8th Cir. 2005)); *see Blodgett*, 394 F.3d at 1039 ("[A] shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie.").

19

Here, the Hatchers initially bore the burden of proving the Commissioner's deficiency determination to be erroneous. *See Brinkley*, 808 F.3d at 663. Both sides apparently agree that the Hatchers complied with I.R.C. § 7491(a), so the burden of proof should shift to the Commissioner. Yet, the tax court did not need to explicitly decide whether the burden of proof shifted because both parties offered admissible, credible evidence for trial. *See Whitehouse Hotel*, 615 F.3d at 332. The tax court, therefore, could decide the case in favor of the party whose case was supported by the weight of the evidence. *See id.* And because there was no apparent "evidentiary tie," there is no justification for disturbing the tax court's decisions. *See Blodgett*, 394 F.3d at 1039. Also, as discussed previously, "the preponderance of the evidence favors the Commissioner's deficiency determination, so any error in the [tax] court's allocation of the burden of proof is harmless." *Brinkley*, 808 F.3d at 664. Thus, there are no grounds to reverse the tax court's judgment on the basis of the burden of proof issue.

## III. CONCLUSION

None of the Hatchers' arguments justifies holding that the tax court clearly erred in its factual determinations. There is also no legal basis for reversing the tax court's judgment. Accordingly, we AFFIRM.